# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

```
_____
                                         )
ST. MARYS REGIONAL                       )
MEDICAL CENTER, et al.,                  )
                                         )
                                         )
                         Plaintiffs,     )
                                         )
            v.                           )          No. 1:23-cv-1594-RCL
                                         )
XAVIER BECERRA, Secretary                )
of Health and Human Services,            )
                                         )
                         Defendant.      )
_____)
```

## DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Defendant, the Secretary of Health and Human Services, respectfully cross-moves this Court for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. In support of this motion, Defendant refers the Court to the accompanying Memorandum in Support of Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment.

A proposed order is attached.

1

Dated: June 7, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ERIC BECKENHAUER
Assistant Branch Director
Civil Division

<u>Of Counsel</u>

SAMUEL R. BAGENSTOS
General Counsel

JANICE L. HOFFMAN
Associate General Counsel

SUSAN MAXSON LYONS
Deputy Associate General Counsel
for Litigation

ALEXANDER R. WHITE
Attorney

*United States Department of Health &
Human Services*

 /s/ Peter M. Bryce
PETER M. BRYCE
Illinois Bar No. 6244216
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW, Room 11106
Washington, D.C. 20005
Tel: (202) 616-8335
Fax: (202) 616-8470
E-mail: peter.bryce@usdoj.gov

*Attorney for Defendants*

.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ST. MARYS REGIONAL MEDICAL CENTER, *et al.*, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:23-cv-1594-RCL |
| XAVIER BECERRA, Secretary of Health and Human Services, | ) ) ) | |
| Defendant. | ) ) | |

# MEMORANDUM IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 3

I.     Statutory and Regulatory Background................................................................ 3

     A.    The Medicare Statute and the Prospective Payment System.................... 3

     B.    The Budget Neutrality Requirement and the Prohibition on
          Administrative or Judicial Review.............................................................. 4

     C.    The Determination of IPPS Payment Rates for FFYs 1984
          and 1985 .................................................................................................... 5

     D.    The Medicare Reimbursement Review Process ......................................... 8

II.    Procedural Background..................................................................................... 9

     A.    Administrative Proceedings....................................................................... 9

     B.    This Case ................................................................................................. 12

STANDARD OF REVIEW .......................................................................................... 13

ARGUMENT ............................................................................................................... 14

I.     The Board Correctly Applied the Preclusion Provision to Dismiss
     Plaintiffs' Challenge to Their FFY 2019 payments ........................................ 14

     A.    The Board Correctly Concluded That Plaintiffs' Challenge
          Is Inextricably Intertwined With the Unreviewable Budget
          Neutrality Adjustments ............................................................................ 15

     B.    The Text of the Statute Confirms that Plaintiffs' Challenge Is
          Inextricably Intertwined with the Unreviewable Budget Neutrality
          Adjustments ............................................................................................. 18

     C.    The Structure and Purpose of the Statute Confirm that Plaintiffs'
          Challenge Is Inextricably Intertwined with the Unreviewable Budget
          Neutrality Adjustments ............................................................................ 22

     D.    Plaintiffs Provide No Basis to Set Aside the Board's Dismissal
          Decision ................................................................................................... 25

          1.    The Preclusion Provision is not limited to "direct"
               challenges to the budget neutrality adjustment............................ 25

          2.    Plaintiffs fail to refute the Board's findings about the
               effect of the budget neutrality adjustments.................................. 26

          3.    Plaintiffs misapply the applicable case law ................................. 29

          4.    Plaintiffs' arguments about the scope of preclusion
               are meritless .................................................................................. 32

          5.    Plaintiffs cannot avoid preclusion by seeking relief
               pertaining to fiscal years after FFY 1985 ...................................... 34

II.    The Court Has No Jurisdiction to Review the Merits of Plaintiffs'

i

Claims Under the Ultra Vires Doctrine or Otherwise........................................... 37

    A.    The Ultra Vires Doctrine Does Not Apply Because Congress Expressly Precluded Review...................................................................... 37

    B.    Plaintiffs Cannot Show Error, Let Alone the Sort of "Extreme" Error Required Under the Ultra Vires Doctrine...................................... 37

III.    The Court Should Not Retain Jurisdiction or Impose Deadlines If It Remands........................................................................................................... 42

CONCLUSION................................................................................................................ 43

# TABLE OF AUTHORITIES

## Cases

*Advocate Christ Med. Ctr. v. Azar*,
   No. 17-cv-1519 (TSC), 2022 WL 2064830 (D.D.C. June 8, 2022)........................................ 13

*Alaska Airlines, Inc. v. TSA*,
   588 F.3d 1116 (D.C. Cir. 2009) ........................................................................................... 14

*Allina Health Servs. v. Azar*,
   No. CV 16-150 (RC), 2020 WL 7042869 (D.D.C. Jan. 2, 2020) ........................................... 42

*Am. Clinical Lab'y Ass'n v. Azar*,
   931 F.3d 1195 (D.C. Cir. 2019) ...................................................................................... 30, 31

*Am. Hosp. Ass'n v. Becerra*,
   596 U.S. 724 (2022) ....................................................................................................... 31, 32

*Amgen  Inc. v. Smith*,
   357 F.3d 103 (D.C. Cir. 2004) ............................................................................................. 23

*Ascension Borgess Hosp. v. Becerra*,
   61 F.4th 999 (D.C. Cir. 2023) ........................................................................................ 17, 19

*Cape Cod Hosp. v. Sebelius*,
   630 F.3d 203 (D.C. Cir. 2011) .......................................................................................... 4, 38

*Cardiosom, LLC v. United States*,
   656 F.3d 1322 (Fed. Cir. 2011) ........................................................................................... 23

*Citizens to Preserve Overton Park v. Volpe*,
   401 U.S. 402 (1971) ............................................................................................................. 13

*DCH Reg'l Med. Ctr. v. Azar*,
   925 F.3d 503 (D.C. Cir. 2019) ..................................................................................... *passim*

*Dist. Hosp. Partners, L.P. v. Burwell*,
   786 F.3d 46 (D.C. Cir. 2015) ............................................................................................... 14

*Fla. Health Scis. Ctr., Inc. v. HHS*,
   830 F.3d 515 (D.C. Cir. 2016) ........................................................................... 19, 26, 29, 30

*Good Samaritan Hosp. v. Shalala*,
   508 U.S. 402 (1993) ............................................................................................................... 3

iii

*Griffith v. Fed. Lab. Rels.Auth.*,
842 F.2d 487 (D.C. Cir. 1988) .................................................................. 37

*HCA Health Servs. of Tenn., Inc. v. Thompson*,
207 F. Supp. 2d 719 (M.D. Tenn. 2002) .................................... 34, 39, 40

*Kaiser Found. Hosps. v. Sebelius*,
708 F.3d 226 (D.C. Cir. 2013) .................................................................. 39

*Knapp Med. Ctr. v. Hargan*,
875 F.3d 1125 (D.C. Cir. 2017) .......................................................... 14, 15

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .................................................................................. 42

*Mem'l Hosp./Adair Cnty. Health Ctr., Inc. v. Bowen*,
829 F.2d 111 (D.C. Cir. 1987) .................................................................. 14

*Mercy Gen. Hosp. v. Azar*,
410 F. Supp. 3d 63 (D.D.C. 2019) ............................................................ 42

*Mercy Hosp., Inc. v. Azar*,
891 F.3d 1062 (D.C. Cir. 2018) ...................................... 19, 20, 26, 31

*Methodist Hosp. of Sacramento v. Shalala*,
38 F.3d 1225 (D.C. Cir. 1994) ...................................................... 3, 4, 14

*Nat'l Ass'n of Mfrs. v. U.S. Dep't of Interior*,
134 F.3d 1095 (D.C. Cir. 1998) ................................................................ 36

*Nuclear Energy Inst., Inc. v. EPA*,
373 F.3d 1251 (D.C. Cir. 2004) ................................................................ 36

*Nyunt v. Chairman, Broad. Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009) .................................................................. 37

*PPG Indus., Inc. v. United States*,
52 F.3d 363 (D.C. Cir. 1995) .................................................................... 42

*S. Co. Servs., Inc. v. FCC*,
313 F.3d 574 (D.C. Cir. 2002) .................................................................. 13

*Saint Francis Med. Ctr. v. Azar*,
894 F.3d 290 (D.C. Cir. 2018) ............................................................ 34, 38

*Saint Francis Med. Ctr. v. Becerra*,
No. 1:22-cv-1960-RCL (D.D.C. Sept. 27, 2023), 2023 WL 6294168 .................................... 12

iv

*Tex. All. for Home Care Servs. v. Sebelius,*
    681 F.3d 402 (D.C. Cir. 2012) ................................................................ *passim*

*Wash. Ass'n for Television & Child. v. FCC,*
    712 F.2d 677 (D.C. Cir. 1983) ................................................................ 36

*Wash. Hosp. Ctr. v. Bowen,*
    795 F.2d 139 (D.C. Cir. 1986) ................................................................ 4, 34

*Your Home Visiting Nurse Servs., Inc. v. Shalala,*
    525 U.S. 449 (1999) ................................................................................ 14

## **Statutes**

5 U.S.C. § 706(2)(A) .................................................................................... 14

42 U.S.C. 1395oo(f)(1) ................................................................................ 9, 13

42 U.S.C. § 1395 .......................................................................................... 3

42 U.S.C. § 1395oo(b) ................................................................................ 8

42 U.S.C. § 1395oo(g)(2) ............................................................................ 5, 6

42 U.S.C. § 1395ww(d) ................................................................................ 4

42 U.S.C. § 1395ww(d)(2) ............................................................................ 20

42 U.S.C. § 1395ww(d)(2)(A) ...................................................................... 38, 40

42 U.S.C. § 1395ww(d)(2)(F) ...................................................................... 7, 8

42 U.S.C. § 1395ww(d)(3) ............................................................................ 21, 22, 24

42 U.S.C. § 1395ww(d)(3)(A) ...................................................................... 4, 39

42 U.S.C. § 1395ww(d)(7) ............................................................................ *passim*

42 U.S.C. § 1395ww(e)(1) ............................................................................ 5, 6, 15, 22

42 U.S.C. § 1395ww(e)(1)(A) ...................................................................... 33

42 U.S.C. § 1395ww(e)(1)(B) ...................................................................... 6, 15, 24

42 U.S.C. § 1395ww(h)(4)(F) ...................................................................... 39

42 U.S.C. § § 1395oo(c) .............................................................................. 8, 9

v

Social Security Amendments of 1983,
   Pub. L. No. 98–21, § 601, 97 Stat. 65, 149 .......................................................... 3, 24

**Rules**

Federal Rule of Civil Procedure 56(a) ........................................................................ 13

**Regulations**

42 C.F.R. § 405.1837 ................................................................................................... 8

42 C.F.R. § 405.1840 ................................................................................................... 8

42 C.F.R. § 405.1842 ......................................................................................... 9, 10, 11

48 Fed. Reg. at 39,763 (Sept. 1, 1983) ...................................................................... 6

48 Fed. Reg. 39,752 (Sept. 1, 1983) .......................................................................... 5

48 Fed. Reg. at 39,764 (Sept. 1, 1983) ...................................................................... 6

48 Fed. Reg. at 39,887 (Sept. 1, 1983) ...................................................................... 7

48 Fed. Reg. 39,767 (Sept. 1, 1983) ....................................................................... 5, 7

49 Fed. Reg. 334 (Jan. 3, 1984). ................................................................................ 7

49 Fed. Reg. 234 (Jan. 3, 1984). .......................................................................... 7, 10

49 Fed. Reg. 34,728 (Aug. 31, 1984) ......................................................................... 7

49 Fed. Reg. 34,769 (Aug. 31, 1984) ......................................................................... 7

50 Fed. Reg. 35,704 (Sept. 3, 1985) .......................................................................... 6

50 Fed. Reg. 35,646 (Sept. 3, 1985) ..................................................................... 6, 16

50 Fed. Reg. at 35,697 (Sept. 3, 1985) ................................................................ 16, 36

56 Fed. Reg. 43,358 (Aug. 30, 1991) ....................................................................... 40

56 Fed. Reg. 43,386-87 (Aug. 30, 1991). ................................................................ 40

**Other Authorities**

1983 U.S.C.C.A.N. 219 ............................................................................................. 25

**INTRODUCTION**

Plaintiffs are more than 220 hospitals that challenge the way certain Medicare payments were calculated for federal fiscal year ("FFY") 2019.  Although they seek payment only for FFY 2019, their claim is based on a supposedly erroneous calculation made by the Secretary of Health and Human Services more than forty years ago, when the current the Medicare inpatient prospective payment system ("IPPS") was first implemented.  Plaintiffs say this error led to an unlawful understatement in certain "standardized amounts" used to determine FFY 1984 payments, and that this error was then "carried forward," year after year, causing similar errors in all subsequent FFYs, ultimately resulting in the allegedly erroneous FFY 2019 payments.  The basis for this claim under the Medicare statute is unclear, as is the attenuated chain of causation connecting the 1983 "error" to the FFY 2019 payments.

The merits of plaintiffs' challenge to decades-old computations are not before the Court, however, because in the agency decision under review here, that claim was dismissed by the Provider Reimbursement Review Board ("Board") for lack of jurisdiction.  The Board found that that plaintiffs' challenge would unavoidably implicate, and was inextricably intertwined with, the validity of certain downward adjustments to the FFY 1984 and 1985 standardized amounts, which the Secretary made to ensure that aggregate IPPS payments for those fiscal years remained level with what they would have been under the payment system in effect before FFY 1984.  Because Congress had prohibited all administrative or judicial review of those "budget neutrality" adjustments in the statute implementing IPPS—expressly stating that "[t]here shall be no administrative or judicial review under section 1395oo of this title or otherwise of . . . the determination of the requirement, or the proportional amount, of any adjustment" effectuating those requirements, 42 U.S.C. § 1395ww(d)(7)—the Board found that plaintiffs' challenge must

1

be dismissed.  Plaintiffs now seek judicial review of the Board's dismissal, arguing that the Board misapplied the budget neutrality preclusion provision and that, in any event, their challenge to FFY 2019 payments is judicially reviewable under the *ultra vires* doctrine.

The Court should grant summary judgment in favor of the Secretary.  The Board's application of the preclusion provision was correct.  As it explained, plaintiffs' assertion that the standardized amounts for FFY 1984 and 1985 were too low would invariably run up against the Secretary's budget neutrality adjustments, which were based on her determination that the amounts were too high.  The D.C. Circuit has repeatedly held that similar preclusion provisions bar review where, as in this case, providers seek to challenge agency actions that are "inextricably intertwined" with the action Congress has deemed unreviewable.  The Board's application of the preclusion provision is also confirmed by the structure and purpose of the statute, which make clear that this sort of challenge is exactly the sort that Congress intended to prevent.

The Court should also deny plaintiffs' request to assume jurisdiction over their challenge to the FFY 2019 payments under the *ultra vires* doctrine.  That doctrine does not apply where, as here, the statute expressly precludes judicial review.  And it also does not apply absent "extreme" agency error.  Plaintiffs have not alleged error, let alone extreme error.  First, the 1983 calculation error alleged here is material only to the calculation of FFY 1984 standardized amounts; it has no legal bearing on standardized amounts for subsequent fiscal years.  Second, plaintiffs have not shown there was a legally cognizable error in the Secretary's 1983 calculation or that the Secretary was obligated to perform the calculation with the kind of precision plaintiffs suggest.  Finally, plaintiffs have not plausibly alleged that any 1983 error did, in fact, have some quantifiable effect on their FFY 2019 payments given intervening corrections and adjustments over the ensuing 30-

2

plus years (including the budget neutrality adjustments at issue) that would have negated the effect of any such error.

## BACKGROUND

### I.    Statutory and Regulatory Background

#### A.    The Medicare Statute and the Prospective Payment System

The Medicare statute, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, sets forth a federal health insurance program for the aged and disabled.  The Secretary administers the Medicare program through the Centers for Medicare & Medicaid Services ("CMS"), a component agency of the Department of Health and Human Services.  CMS in turn delegates some of its responsibilities, including issuing notices of program reimbursement ("NPRs"), to private Medicare Administrative Contractors ("MACs").  *See id.* §§ 1395u, 1395kk-1.  This case involves Medicare Part A, which provides insurance for covered inpatient hospital and related post-hospital services.  The program pays hospitals and other providers for covered medical services furnished to eligible individuals.  Medicare sets out a "complex statutory and regulatory regime," *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 404 (1993), through which hospitals can obtain payment for services provide to Medicare beneficiaries.

Prior to 1983, Medicare reimbursed hospitals based on the "reasonable costs" actually incurred in providing services to Medicare patients.  *See Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C. Cir. 1994) (citation omitted).  Under this system, "providers were reimbursed for the actual costs that they incurred," so that "as hospital costs increased, so too did Medicare reimbursements."  *Id.*  Concerned about rising costs, Congress "completely revised the scheme for reimbursing Medicare hospitals," *id.*, by amending the statute in 1983, *see* Social Security Amendments of 1983, Pub. L. No. 98–21, § 601, 97 Stat. 65, 149 ("1983 Amendments").

3

Under the new system, known as the inpatient prospective payment system ("IPPS"), hospitals are paid not based on actual costs, but on prospectively determined rates, depending on the kind of treatment rendered to each Medicare beneficiary. *Methodist Hosp.*, 38 F.3d at 1227. By informing hospitals in advance of the payments they will receive per patient, Congress hoped to induce them to operate more efficiently. *Id.*; *Wash. Hosp. Ctr. v. Bowen*, 795 F.2d 139, 142 (D.C. Cir. 1986).

At a very general level, the annual process for determining IPPS payment rates involves multiplying a base payment rate, known as a "standardized amount," by a weighing factor that reflects the severity of the patient's diagnosis, as categorized into several hundred "diagnosis related groups" or "DRGs." 42 U.S.C. § 1395ww(d). The standardized amount, which roughly reflects the average cost incurred for each patient treated, is not calculated from scratch every year. *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011) (citations omitted). Rather, the standardized amount for a given fiscal year is based on the standardized amount computed for the previous year, which is then updated and adjusted in various ways. 42 U.S.C. § 1395ww(d)(3)(A).

Recognizing that IPPS "dramatically changed" the Medicare payment system, Congress provided a four-year transition period to gradually phase in the new system. *Methodist*, 38 F.3d at 1228. During that period, an increasing proportion (25 percent per year) of payment rates would be based on IPPS (the "Federal Portion"), and a decreasing proportion would be based on the prior "reasonable cost" system (the "Hospital Specific Portion"). *Id.* After the transition period, reimbursement was to be based solely on IPPS. This case involves calculation the Federal Portion.

### B.     The Budget Neutrality Requirement and the Prohibition on Administrative or Judicial Review

For the first two years of IPPS, FFYs 1984 and 1985, Congress required the Secretary to ensure that aggregate payments under the new system would be no greater and no less than the

aggregate amount that "would have been payable" under the prior reasonable cost system.  42 U.S.C. § 1395ww(e)(1).  In other words, it required the Secretary to implement the system in a "budget neutral" manner.  *See* Medicare Program, Prospective Payments for Medicare Inpatient Hospital Services, 48 Fed. Reg. 39,752, 39,767 (Sept. 1, 1983).  To that end, the statute instructed the Secretary to adjust the Hospital Specific Portion and the Federal Portion to ensure that aggregate payments were budget neutral for FFYs 1984 and 1985, as compared to what would have been paid under prior law.  *Id.* § 1395ww(e)(1)(A) & (B).  As to the Federal Portion, the statute instructed the Secretary to accomplish this by adjusting the standardized amounts for each of the two fiscal years.  *Id.* § 1395ww(e)(1)(B) (providing that the Secretary shall make such "adjustment in . . . the average standardized amounts otherwise computed . . . as may be necessary to assure that . . . the aggregate payment amounts . . . are not greater than or less than" the amount that would have been payable "under the law as in effect before" IPPS).

Congress also mandated that the Secretary's budget neutrality adjustments under § 1395ww(e)(1) would not be subject to administrative or judicial review.  *Id.* § 1395ww(d)(7).  The applicable provision (the "Preclusion Provision") states, *inter alia*, that "[t]here shall be no administrative or judicial review under section 1395oo of this title or otherwise of . . . the determination of the requirement, or the proportional amount, of any adjustment effected pursuant to subsection (e)(1)."  *Id.*  This preclusion of administrative and judicial review is also reiterated and incorporated into the section of the Medicare statute providing for administrative and judicial review.  *See* 42 U.S.C. § 1395oo(g)(2).

### C.    The Determination of IPPS Payment Rates for FFYs 1984 and 1985

The methodology for determining the budget neutral IPPS payment rates for the first year of IPPS, FFY 1984, is set forth in Paragraph 2 of § 1395ww(d).  To determine those payment rates,

the statute directed the Secretary to develop and modify certain base year cost data in various ways. 48 Fed. Reg. at 39,763.  Of particular relevance here, it required the Secretary to use "the most recent cost reporting period for which data are available" to "determine the allowable operating costs per discharge for inpatient hospital services."  *Id.* § 1395ww(d)(2)(A).  In implementing this requirement, the Secretary determined that the "most recent" data available was for calendar year 1981.  48 Fed. Reg. at 39,764.  Audits of the 1981 data were not yet complete, however, so the Secretary calculated the costs-per-discharge figure using unaudited data.  *Id.*; Medicare Program; Changes to the Inpatient Hospital Prospective Payment System and Fiscal Year 1987 Rates, 50 Fed. Reg. 35,646, 35,704 (Sept. 3, 1985).  In determining the number of discharges, CMS "relied on a monthly tabulation of Medicare discharges covering the same periods represented in the cost report."  48 Fed. Reg. at 39,764.  After removing certain excluded costs "to the extent possible," the Secretary divided the resulting number by the number of Medicare discharges, resulting in the initial costs-per-discharge calculation.  48 Fed. Reg. at 39,763-64.  Then, in accordance with the statute, the Secretary updated that figure for inflation, "standardized" it to remove effects of certain variable costs, computed average standardized amounts for hospitals located in urban and rural areas of nine regions,[1] and made certain other adjustments, including to account for certain outlier payments.  42 U.S.C. § 1395ww(d)(2)(B)-(E).  *See* 48 Fed. Reg. at 39,764-67 (describing the Secretary's implementation of these various requirements).

The statute then required the Secretary to apply the budget neutrality adjustment provision, 42 U.S.C. § 1395ww(e)(1)(B), so that the resulting standardized amounts were set at the level necessary to ensure that aggregate payments remained level with what they would have been under

---

[1] This step resulted in 18 standardized amounts, though as a result of intervening amendments, only one standardized amount is used today.  Board Decision, AR 000472 n.18.

prior law. *See* 42 U.S.C. § 1395ww(d)(2)(F) ("The Secretary shall adjust each of such average standardized amounts as may be required under subsection (e)(1)(B)"). To implement this requirement, the Secretary made complex, actuarially determined adjustments to the average standardized amounts. *See* 48 Fed. Reg. at 39,887; *see also id.* at 39,887-90 (Addendum VIII) (describing methodology in detail). The Secretary calculated a budget neutrality adjustment of .969 in the Interim Final Rule, *id.* at 39,767, but revised it slightly to .970 in the Final Rule, Medicare Program; Prospective Payment for Medicare Inpatient Hospital Services, 49 Fed. Reg. 234, 334 (Jan. 3, 1984). After applying the budget neutrality adjustment, the statute then required the Secretary to compute final IPPS payment rates by calculating DRG specific rates and adjusting for different wage levels. 42 U.S.C. § 1395ww(d)(2)(G)-(H).

The methodology for determining budget neutral IPPS payment rates for FFY 1985 is set forth in Paragraph (3) of subsection 1395ww(d). It is similar to, but more truncated than, the process for FFY 1984 IPPS. As noted above, the statute does not contemplate recalculating standardized amounts from scratch for subsequent fiscal years but rather begins with the standardized amounts "computed" for the previous year—here, FFY 1984. *Id.* § 1395ww(d)(3)(A). The statute then required the Secretary to update those amounts for inflation, apply a case mix adjustment, and adjust for outlier payments. *Id.* § 1395ww(d)(3)(A)-(B). Thereafter, the statute once again required the Secretary to adjust the standardized amounts in accordance with § 1395ww(e)(1)(B) to achieve budget neutrality as compared to what would have been paid under prior law. *Id.* § 1395ww(d)(3)(C). "Based on the data available to date," the Secretary applied a budget neutrality adjustment of .950% for the regional rate and .954% for the national rate. Medicare Program; Changes to the Inpatient Hospital Prospective Payment System

and Fiscal Year 1985 Rates, 49 Fed. Reg. 34,728, 34,769 (Aug. 31, 1984).[2]  Similar to the FFY

1984 process, the Secretary then computed final FFY 1985 IPPS payment rates by calculating

DRG specific rates and adjusting for different wage levels.  42 U.S.C. § 1395ww(d)(3)(D)-(E).

The determination of IPPS payment rates in subsequent fiscal years is also governed by

Paragraph 3 of 1395ww(d) and is largely the same except the statute does not require the Secretary

to adjust for budget neutrality for years after FFY 1985.  *See id.* § 1395ww(d)(3).

### D.    The Medicare Reimbursement Review Process

The Medicare statute sets forth an administrative review process for Medicare providers

dissatisfied with reimbursement decisions.  A hospital that receives prospective payments may

"obtain a hearing" before the Provider Reimbursement Review Board if it is "dissatisfied with a

final determination of the Secretary as to the amount of the payment."  42 U.S.C. §

1395oo(a)(1)(A)(ii).  The statute specifies certain other prerequisites to a Board hearing, including

an amount-in-controversy requirement and a requirement to appeal within 180 days of the

Secretary's final determination, *id.* § 1395oo(a)(2)-(3); *see also* 42 C.F.R. § 405.1840 (outlining

the rules regarding the Board's jurisdiction).  In group appeals, like those at issue here, providers

must also present a common question of fact or law.  *See* 42 U.S.C. § 1395oo(b); 42 C.F.R. §

405.1837.   As noted above, § 1395oo also incorporates 42 U.S.C. § 1395ww(d)(7), thereby

reiterating that the Secretary's budget neutrality adjustments are not subject to review under

§ 1395oo "or otherwise."

---

[2]  Effective October 1, 1984, the Federal Portion was a blend of national and regional rates, resulting in two budget neutrality adjustments listed in the text.  49 Fed. Reg. 34,728, 34,769 (Aug. 31, 1984).

If the Board finds that it has jurisdiction, it holds a hearing and renders a decision on the merits of the dispute. 42 U.S.C. § 1395oo(c)&(d). The MAC is the counterparty to the provider during PRRB proceedings. The Board's decision is "final" unless it is reversed, affirmed, or modified by the Secretary, through his delegate, the Administrator of CMS, within sixty days. *Id.* § 1395oo(f)(1). A hospital may seek judicial review of "any final decision of the Board" by filing suit in federal district court within sixty days. *Id.*

The Medicare statute also provides a limited exception to the requirement that hospitals proceed through the full Board hearing process to obtain judicial review. In cases where the Board has jurisdiction to hold a hearing, providers may obtain expedited judicial review ("EJR") if the Board finds that it lacks authority to decide a "question of law or regulations relevant to the matters in controversy." *Id.*; *see also* 42 C.F.R. § 405.1842. If the Board makes such a determination, either on its own motion or at the request of a provider, the provider may then seek judicial review of the matter within sixty days. *See* 42 U.S.C. § 1395oo(f)(1); *see also* 42 C.F.R. § 405.1842.

## II.    Procedural Background

### A.    Administrative Proceedings

This action grows out of five group appeals that plaintiffs filed with the Board to challenge their FFY 2019 payment determinations: PRRB Case Nos. 19-1723GC, 19-1735GC, 19-1763, 19-0233GC, 19-1628GC and 19-0710GC.[3] Plaintiffs presented the issue as follows:

> [W]hether the hospitals have been underpaid for the periods covered by the 2019 federal fiscal year because the inpatient hospital prospective payment system (PPS) standardized amounts are understated for the 2019 federal year due to the

---

[3] As plaintiffs have noted, the procedural background of the five group appeals is largely uniform, and in many instances, contains largely duplicative documents. *See* Pls.' MSJ Mem. at 13 n.3, ECF No. 20-1. Accordingly, like plaintiffs, the Secretary is describing the procedural background generally, and is generally limiting citations to the first instance of each representative document in the multiple group appeals. *See id.*

> Secretary's failure to properly distinguish between patient transfers and discharges
> in establishing the PPS 1983 base year amounts.

*See*, *e.g.*, Admin. Record ("AR") 005234; *see also* AR 000462-63 (Dismissal Decision) (alteration in original) (quoting plaintiffs' submissions).   The plaintiffs argued that their FFY 2019 standardized amounts (and resulting IPPS payments) were unlawfully understated as a result of an alleged calculation error the Secretary made in 1983 when she was first implementing IPPS.   AR 001518-43.   According to plaintiffs, when the Secretary calculated the "allowable operating costs per discharge" under § 1395ww(d)(2)(A), she improperly treated "transfers" as "discharges," thereby resulting in an unlawfully understated costs-per-discharge calculation, which in turn led to unlawfully understated standardized amounts for FFY 1984.   *Id.*  They further asserted that these unlawfully understated standardized amounts for FFY 1984 were then "carried forward" year-after-year in a manner that resulted in all subsequent FFY standardized amounts being unlawfully understated, including, ultimately, the FFY 2019 standardized amounts at issue here.   *Id.*

On August 10, 2020, plaintiffs filed a request urging the Board to grant EJR.   Plaintiffs argued that there were no disputed factual issues, that the Board had jurisdiction over the appeals, and that the Board lacked authority to decide the legal question at issue.   *See* AR 001076-87.   In describing their own claim, plaintiffs repeatedly asserted that the Secretary's allegedly erroneous calculation resulted in a failure to comply with FFY 1984 budget neutrality requirements.   They argued that aggregate payments for FFY 1984 were lower than what would have been paid under the reasonable cost system because the Secretary had failed to properly distinguish between transfers and discharges in the initial costs-per-discharge calculation.   AR 000178, 001081.

Plaintiffs also submitted an "Expert Report" along with their EJR request.   AR 001422-55. The report opined that the 1983 "error" caused the cost-per-discharge figure to be understated by

just over half of one percent (0.65%), and that this in turn caused a 0.65% understatement in the FFY 1984 standardized amounts, as well as a 0.65% understatement in the standardized amounts and IPPS payments for all subsequent fiscal years. *Id.* It also asserted that the budget neutrality adjustment did not correct the problem because it was based on the same erroneous costs-per-discharge error. *Id.* at 001424-25, ¶ 7 & n.2. It also stated that in calculating the budget neutrality adjustment, the Secretary's purported error had caused her to underestimate average payments per discharge that would have been made under pre-IPPS law and also to underestimate payments per discharge under IPPS. *Id.* at 001448, ¶¶ 61-62. According to the report, if the Secretary had "appropriately" accounted for transfers, she would have increased both estimates proportionately by 0.65%, such that the budget neutrality adjustment would not have changed. *Id.*

On August 25, 2020, the MAC urged the Board to deny plaintiffs' EJR request. It explained that plaintiffs' challenge implicated the budget neutrality preclusion provision, 42 U.S.C. § 1395ww(d)(7), and that there were unresolved factual issues, including complex questions about the effect, if any, of any alleged 1983 error on the FFY 2019 standardized amounts. AR 001950-54. In September 2020, the Board requested additional information on the MAC's jurisdictional challenge. AR 000987-001003. In response, the MAC argued that plaintiffs' challenge was barred by the Preclusion Provision because, *inter alia*, any upward adjustment to the FFY 1984 standardized amount would have required an offsetting adjustment to the Secretary's budget neutrality adjustment. AR 000982-86. Plaintiffs argued that their challenges to the FFY 1984 standardized amounts do not implicate the Preclusion Provision and are not inextricably intertwined with the budget neutrality adjustments. AR 000970-79.

In late 2021, the Board denied the August 2020 EJR requests and requested additional information, noting the need to develop the record on plaintiffs' claim as it pertained to actions

and developments dating back 30-40 years.  AR 000948-49 000954-67.  The parties submitted responses to the Board's questions, AR 000897-913, though plaintiffs' response included lengthy objections and called the Board's questions "irrelevant" and "inappropriately burdensome," AR 000897-913.  While the Board was considering these materials, a group of hospitals seeking to bring identical claims and represented by the same counsel as plaintiffs here sought to bypass the Board review process and bring an action for immediate review in this Court, notwithstanding the Board's ongoing review of its jurisdiction.  This Court rejected that claim, finding that the hospitals had filed "premature motions in an improper venue."  *Saint Francis Med. Ctr. v. Becerra*, No. 1:22-cv-1960-RCL (D.D.C. Sept. 27, 2023), 2023 WL 6294168, at *8.

On April 6, 2023, the Board dismissed the five group appeals for lack of jurisdiction, finding that the Preclusion Provision prohibited review of plaintiffs' challenge to the FFY 2019 payments.  AR 000462-500 ("Dismissal Decision").  The Board found in the Dismissal Decision that plaintiffs' challenge to the 1983 calculation and resulting FFY 1984/1985 standardized amounts were "inextricably intertwined" with the unreviewable budget neutrality adjustments for FFYs 1984 and 1985.  AR 000480, 000483, 000487-88, 00493.  The Board found that plaintiffs' challenge necessarily implicated and could not simply "pass through" those unreviewable adjustments, because the adjustments were tied to a fixed reference point external to IPPS—namely, the amount of aggregate payments that "would have" been made for FFYs 1984 and 1985 under prior law.  *Id.*  In addition, the Board found that the Preclusion Provision barred plaintiffs' challenge to the budget neutrality adjusted standardized amounts carried forward after FFY 1985 through subsequent years to FFY 2019.  *Id.* at 000488.

B.    **This Case**

Plaintiffs filed this action on June 2, 2023, seeking judicial review of the Dismissal Decision.  *See* Compl. ECF No. 1.  Plaintiffs now move for summary judgment.  See Pls.' MSJ, ECF No. 20.  They argue that the Board improperly dismissed their challenge to the FFY 2019 standardized amounts and that its application of the Preclusion Provision was improper.  They ask the Court to hold unlawful and set aside Board's Dismissal Decision, and to hold that the Preclusion Provision does not bar review of their claims.  Plaintiffs also ask the Court to assert jurisdiction over their claims under the *ultra vires* doctrine and proceed to full briefing on the merits.  Alternatively, if the Court remands, they ask the Court to "retain jurisdiction" on remand and to direct the CMS Administrator and the Board to take various actions on remand within specified time limits.  *See* Pls.' MSJ Mem. at 44.

The Secretary hereby opposes plaintiffs' motion and cross-moves for summary judgment.

## STANDARD OF REVIEW

Under the Medicare statute, judicial review of the agency's decision is governed by the applicable provisions in the Administrative Procedure Act ("APA").  42 U.S.C. § 1395oo(f)(1).  APA cases are usually decided on summary judgment.  The Federal Rule of Civil Procedure 56(a) summary judgment standard, requiring the court to determine if there is a genuine dispute of material fact, does not apply.  Rather, the district court sits as an appellate tribunal, reviewing the administrative record.  "[S]ummary judgment serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review."  *See Advocate Christ Med. Ctr. v. Azar*, No. 17-cv-1519 (TSC), 2022 WL 2064830, at *5 (D.D.C. June 8, 2022) (internal quotation and citation omitted), *aff'd*, 80 F.4th 346, 354 (D.C. Cir. 2023), *docketing petition for cert.* (U.S. Jan. 3. 2024).

13

The APA establishes a narrow standard of review. *S. Co. Servs., Inc. v. FCC*, 313 F.3d 574, 580 (D.C. Cir. 2002). Final agency action can be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence in a case . . . reviewed on the record of an agency hearing provided by statute." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413 n.30, 414-15 (1971) (citation omitted); *see also* 5 U.S.C. § 706(2)(A), (E). While the Secretary's compliance with the Medicare statute and regulations is reviewable under the arbitrary and capricious standard, and the adequacy of record support for the final decision is reviewable under the substantial evidence standard, "the two standards involve the same level of scrutiny." *Mem'l Hosp./Adair Cnty. Health Ctr., Inc. v. Bowen*, 829 F.2d 111, 117 (D.C. Cir. 1987). Additionally, in Medicare cases such as this, the "tremendous complexity of the Medicare statute . . . adds to the deference which is due to the Secretary's decision." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 60 (D.C. Cir. 2015) (quoting *Methodist Hosp.*, 38 F.3d at 1229); *Alaska Airlines, Inc. v. TSA,* 588 F.3d 1116, 1120 (D.C. Cir. 2009) (agency decisions involving "complex judgments about . . . data analysis that are within the agency's technical expertise" receive "an extreme degree of deference") (citation omitted).

## ARGUMENT

The Secretary respectfully submits that the Court should deny plaintiffs' motion for summary judgment in its entirety and grant summary judgment in the Secretary's favor. As explained below, the Board correctly applied the Preclusion Provision to dismiss plaintiffs' claim and their arguments to the contrary are meritless. Plaintiffs also cannot show the Court has jurisdiction under the *ultra vires* doctrine because, *inter alia*, they have not shown error, much less the "extreme error" required by the doctrine.

14

I.      **The Board Correctly Applied the Preclusion Provision to Dismiss Plaintiffs'**
        **Challenge to Their FFY 2019 payments**

The plaintiffs bear the burden of establishing Board jurisdiction.  *Knapp Med. Ctr. v.*

*Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017); *see also Your Home Visiting Nurse Servs., Inc. v.*

*Shalala*, 525 U.S. 449, 452-53 (1999) (provider must demonstrate Board's appellate jurisdiction).

And while courts generally presume that agency action is reviewable, "that presumption, like all

presumptions used in interpreting statutes, may be overcome by specific language that is a reliable

indicator of congressional intent."  *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 505-06 (D.C. Cir.

2019) (citing *Knapp*, 875 F.3d at 1128).  Where, as here, Congress provides that "there shall be no

administrative or judicial review" of specified agency actions, 42 U.S.C. § 1395ww(d)(7), its intent

to bar review is clear, so the Court need determine only whether the challenged action falls "within

the preclusive scope" of the statute.  *Knapp*, 875 F.3d at 1128; *DCH*, 925 F.3d at 505-06.  The

question is thus whether the Board correctly concluded that plaintiffs' claim requires the prohibited

review of the budget neutrality adjustments for FFY 1984 and 1985, 42 U.S.C. § 1395ww(e)(1).

42 U.S.C. § 1395ww(d)(7) (precluding review of "the determination of the requirement, or the

proportional amount, of any adjustment effected pursuant to [1395ww(e)(1)]").

A.      **The Board Correctly Concluded That Plaintiffs' Challenge Is Inextricably**
        **Intertwined With the Unreviewable Budget Neutrality Adjustments**

The Board correctly found that plaintiffs' claim falls within the preclusive scope of this

provision.  Although plaintiffs seek reimbursement pertaining to the standardized amount

calculated for FFY 2019, their challenge is clearly not limited to the agency's action in the 2019

IPPS rule.  Rather, plaintiffs' claim rests on the premise that an error in the 1983 cost-per-discharge

calculation caused standardized amounts for FFYs 1984 and 1985 (and every subsequent FFY up

to and including FFY 2019) to be unlawfully "understated."  *See* Pls.' MSJ Mem. 5-9; Compl. ¶¶

15

33, 34, 37.   As the Board explained, however, the Secretary applied the budget neutrality adjustment provision, 42 U.S.C. § 1395ww(e)(1)(B), to determine that the standardized amounts for both FFYs 1984 and 1985 were not understated, but *overstated*, and she therefore adjusted them *downward* by approximately 3% for FFY 1984 and 5% for FFY 1985.  AR 000472, 000487-000488, 000493.   The reason for those adjustments was to achieve budget neutrality for each of the two FFYs.   Plaintiffs' attack on the cost-per-discharge calculation, and the allegedly understated FFY 1984/1985 standardized amounts, is thus tantamount to an attack on the validity of these downward adjustments—precisely what the budget neutrality preclusion provision forbids.  42 U.S.C. § 1395ww(d)(7).

The relief plaintiffs seek reinforces this conclusion.  Plaintiffs seek an upward adjustment of the FFY 2019 standardized amount, purportedly to counteract the effect of allegedly understated standardized amounts "carried forward" in all prior years—starting with the original standardized amounts of FFY 1984.   The relief sought would thus not only require a determination that the standardized amounts for FFYs 1984 and 1985 were too low, rather than too high, but would also require the reviewing entity to adjust those amounts *upward* for purposes of "carrying forward" the adjustment for all subsequent fiscal years through FFY 2019.   It would also effectively undo the budget neutrality adjusted standardized amounts allegedly "carried forward" in all subsequent years.   *See* Pls.' MSJ Mem. at 29 n.9 (acknowledging that the Secretary carried forward budget neutrality adjusted standardized amounts) (citing 50 Fed. Reg. 35,646, 35,697 (Sept. 3, 1985)).

Any such adjustment would invariably run up against the Secretary's unreviewable budget neutrality adjustments.   As the Board explained, the budget neutrality adjustments are tied to a "fixed" reference point that is "external" to IPPS—namely, the aggregate payment amounts that "would have" been made for FFY 1984 and FFY 1985 under the earlier, "reasonable cost" system

16

of reimbursement.  AR 000475 (emphasis omitted).  The standardized amounts were thus set at the level the Secretary deemed necessary to ensure that aggregate payments for FFY 1984 and FFY 1985 were not greater or less than the aggregate amount that would have been paid out under prior law.[4]  Consequently, any upward adjustment of those standardized amounts would effectively negate the Secretary's budget neutrality adjustments, which were based on the standardized amounts originally computed using the 1981 costs-per-discharge data.  *Id.*  Moreover, by seeking to adjust FFY 1984/1985 standardized amounts upward, and to carry forward that upward adjustment in subsequent fiscal years, plaintiffs are effectively seeking to undo the effect of budget-neutrality adjusted amounts carried forward through subsequent fiscal years.  *Id.* at 000488.

        In other words, plaintiffs' "cost per discharge" challenge as it pertains to their FFY 2019 standardized amount is "inextricably intertwined" with the unreviewable budget neutrality adjustments of FFY 1984 and FFY 1985.  *See Ascension Borgess Hosp. v. Becerra*, 61 F.4th 999, 1002 (D.C. Cir. 2023) (citing cases).  The Board cannot review plaintiffs' challenge to the standardized amounts carried forward for FFY 1984 and FFY 1985 without effectively second-guessing the validity of the budget neutrality adjustments applied in those years.  Nor could it carry forward the upward "adjustment" sought by plaintiffs' without effectively undoing the Secretary's FFY 1984 and FFY 1985 budget neutrality adjustments.  Plaintiffs' challenge to the allegedly ongoing effect of the purported 1983 error is thus "unavoidably a challenge" to the Secretary's

---

[4] For this reason, the requested upward adjustment could not simply pass through the budget neutrality adjustment of FFY 1984 and FFY 1985, as might occur if it were merely an adjustment for inflation.  AR 000475.

FFY 1984 and FFY 1985 budget neutrality adjustments. *See id.* (quoting *DCH*, 925 F.3d at 506).

As such, review is barred by the Preclusion Provision.

B.    **The Text of the Statute Confirms that Plaintiffs' Challenge
Is Inextricably Intertwined with the Unreviewable Budget Neutrality
Adjustments**

The Board's finding in that regard is supported by the text of the Preclusion Provision, as

well as the structure and purpose of the statute.    Like a number of other similarly-worded

provisions in the Medicare statute, the budget neutrality preclusion provision employs broad and

categorical language, mandating that "[t]here shall be no administrative or judicial review under

section 1395oo . . . or otherwise of," *inter alia*, "the determination of the requirement, or the

proportional amount, of any [budget neutrality] adjustment effected pursuant to subsection (e)(1)."

42 U.S.C. § 1395ww(d)(7).    The D.C. Circuit has long recognized this "specific and emphatic

statutory language," and its "sweepingly" broad preclusive effect.    *See Tex. All. for Home Care*

*Servs. v. Sebelius*, 681 F.3d 402, 408 (D.C. Cir. 2012).    As the *Texas Alliance* court explained, the

"mandate that there be '*no* administrative or judicial review'" under specified review provisions,

"'*or otherwise*' unequivocally precludes review" of agency actions falling within its scope.    *See*

*id.* at 409 (citation omitted).

In keeping with this broad language, the D.C. Circuit has repeatedly held that such

provisions do not just preclude challenges to the action identified in the provision, but also

challenges to actions that are "inextricably intertwined" with the unreviewable action.    Thus, the

D.C. Circuit found that a provision prohibiting review of certain estimates relating to

uncompensated care also barred review of a methodological approach to the estimate that had been

established in a notice-and-comment rule.    *DCH*, 925 F.3d at 505 (citing 42 U.S.C.

§ 1395ww(r)(3)(A)).    The court found the actions were inextricably intertwined because "a

challenge to the methodology for estimating uncompensated care is unavoidably a challenge to the

estimates themselves." *See id.* at 505-507.    In an earlier case, the court held that the same provision

19

precluded a challenge to the Secretary's refusal to use the most recent available data to estimate uncompensated care because the data is inextricably intertwined with the unreviewable estimate. *Fla. Health Scis. Ctr., Inc. v. HHS*, 830 F.3d 515, 518-19 (D.C. Cir. 2016). And in still another case, the court held that a statute barring review of "prospective payment rates" precluded review of certain statutory adjustments that were applied in the calculation of such rates. *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1066 (D.C. Cir. 2018). The court found the actions were "inextricably intertwined" because "a flawed [adjustment] would mean that a . . . rate incorporating that formula must be incorrect because the rate depends in part on the flawed formula." *Id.* at 1067; *see also Ascension Borgess*, 61 F.4th at 1002 (finding that the same provision in *DCH* and *Florida Health* precluded a procedural challenge to an audit protocol used to determine the estimate); *Texas All.*, 681 F.3d at 409-11 (finding that a provision barring review of the "awarding of contracts" barred a challenge to a regulation setting forth financial standards that determine contract eligibility).

This Preclusion Provision here compels the same result. As in the cases above, the provision contains the same "sweepingly" broad preclusive language, *Texas All.*, 630 F.3d at 408. *See* 42 U.S.C. § 1395ww(d)(7). And as in those cases, plaintiffs' attack on the challenged actions would invariably amount to an attack the validity of actions that are expressly shielded from review—here, the Secretary's budget neutrality adjustments for FFYs 1984 and 1985. A reviewing entity "could not find fault" with the standardized amounts resulting from the 1983 cost-per-discharge calculation "without also finding fault" with the FFY 1984/1985 budget neutrality adjustments. *Mercy Hosp.*, 891 F.3d at 1066-67. If, as plaintiffs allege, the cost-per-discharge calculation and standardized amounts were too low because of flaws in the 1981 data used to make the calculation, it would mean that the Secretary's budget neutrality adjustments were also incorrect because the accuracy of that adjustment depends on the validity of those antecedent

20

computations.  *See id.* at 1067 (finding that review of allegedly flawed formula would constitute review of the unreviewable rates "because th[e] rate depends in part on the flawed formula").

Moreover, the challenged actions (the costs-per-discharge calculation and resulting unadjusted standardized amounts) are closely linked in the statute to the unreviewable FFY 1984/1985 budget neutrality adjustments, both textually and analytically.  *See Mercy Hosp.*, 891 F.3d at 1067 (emphasizing that the language of the statute "ties" together the challenged action and the action shielded from review).  For FFY 1984, the actions are tied together as constituent, inter-related steps of a single, unitary process for calculating IPPS payment rates for FFY 1984 in a budget neutral manner.  *See* 42 U.S.C. § 1395ww(d)(2).  That process is set forth in a single paragraph of the statute, paragraph (2) of § 1395ww(d), with each methodological step dependent on and building on the steps preceding it.  *See id.* § 1395ww(d)(2)(A)-(H).  The same is true of the process for calculating budget neutral IPPS payment rates for FFY 1985, a process which is set forth in Paragraph 3 of § 1395ww(d).  *Id.* § 1395ww(d)(3)(A)-(E).  In this statutory scheme, the validity of the budget neutrality adjustment necessarily depends on the validity of the methodological steps that precede it.

Although plaintiffs now try to portray their challenge as unrelated to the budget neutrality adjustment, the challenged costs-per-discharge calculation under § 1395ww(d)(2)(A) is itself the foundational first step in the process for calculating FFY 1984 IPPS payment rates *in a budget neutral manner.  See* 42 U.S.C. § 1395ww(d)(2).  Plaintiffs' own Complaint effectively acknowledges this point.  It states:

> Congress required CMS to set initial IPPS payment rates for FFY 1984 based upon prior year "allowable operating costs per discharge" so that *total IPPS payments to hospitals for FFY 1984 would be level with what they would have been under the "reasonable cost" system for FFY 1984*, and to adjust the rates from there for subsequent FFYs.

21

Compl. ¶ 66 (emphasis added).[5]  And having acknowledged that budget neutrality purpose, the Complaint goes on to assert that the alleged error in the costs-per-discharge calculation caused FFY IPPS payments to be "too low" to achieve that "clear purpose," thereby implicitly confirming that their challenge is inextricably intertwined with the budget neutrality requirements.  *See id.*

Indeed, prior to the budget neutrality preclusion provision being raised as a jurisdictional issue in the administrative proceedings, plaintiffs themselves acknowledged that their claim directly implicates the Secretary's compliance with budget neutrality requirements.  In their August 10, 2020 EJR request, for example, plaintiffs argued that the alleged costs-per-discharge error resulted in the agency's failure to comply with the requirement that FFY 1984 IPPS payments "may not be greater than, nor less than, the payments that would have been paid under the law previously in effect."  EJR Request, at 3, AR001078 (citation omitted).  Plaintiffs stated that

> the IPPS payments for FFY 1984 were *lower* than the payments that Medicare would have made for FFY 1984 if the previous 'reasonable cost' system had remained in place because, when initially implementing IPPS, CMS did not distinguish between 'transfers' and 'discharges' for purposes of calculating the IPPS 'standardized amount' for FFY 1984.

*Id.* (emphasis added), Plaintiffs subsequently reiterated that "the method that CMS used to create the initial IPPS Payment rates for FFY 1984 *caused FFY 1984 IPPS payments to be less than what would have been paid under the previous 'reasonable cost' system, which means that IPPS hospitals were underpaid for FFY 1984 both on a per claim basis and in the aggregate.*"  *Id.* at 001080 (emphasis added).  As discussed further below, the "expert report" plaintiffs submitted along with their EJR request made similar assertions, expressly linking the allegedly erroneous

---

[5] What plaintiffs' Complaint does not note is that the statute contained a similar requirement for FFY 1985.  See 42 U.S.C. § 1395ww(d)(3).

22

costs-per-discharge calculation to an allegedly flawed budget neutrality adjustment. *See infra* at 26-28. *See also* AR 001425 (n.2), 001429 (¶ 19), 001448 (¶¶ 61-62).

### C.    The Structure and Purpose of the Statute Confirm that Plaintiffs' Challenge Is Inextricably Intertwined with the Unreviewable Budget Neutrality Adjustments

The structure and purpose of the statute likewise confirm the Board's conclusion that plaintiffs' challenge is inextricably intertwined with the unreviewable budget neutrality adjustments. The statute is clear that: (1) aggregate payments under the new IPPS system for FFY 1984/1985 should be kept level with what they would have been under the prior system, *see* 42 U.S.C. § 1395ww(e)(1); and (2) the Secretary would be left free to achieve that result without interference resulting from administrative or judicial review, *see id.* § 1395ww(d)(7). In other words, Congress granted the Secretary *unreviewable* authority to modify the FFY 1984/1985 standardized amounts as needed to ensure that aggregate payments overall would be level with what they would have been under prior law. *Id.* § 1395ww(d)(7)(A) & (e)(1)(B).

Given the lengths to which Congress went to prevent disruption of the Secretary's budget neutrality adjustments, it is not reasonable to suppose that it intended to permit challenges that would subvert those efforts. The Secretary's unreviewable authority to adjust standardized amounts to make them budget neutral would have little meaning if providers were free to negate the effect of those adjustments by simply challenging the standardized amounts themselves. As the Board emphasized, the point of budget neutrality is to maintain aggregate payments at a fixed level, external to the IPPS system, in order to ensure that aggregate payments for the first two years of the transition are no greater or less than they would have been under the prior system. AR 000487-88. Allowing providers to challenge calculations that the Secretary relied on to make those adjustments would make it impossible for the Secretary to achieve budget neutrality, as any

alteration achieved through litigation could require a retroactive correction to the original adjustment. *Cf.*, *e.g.*, *Amgen Inc. v. Smith*, 357 F.3d 103, 112 (D.C. Cir. 2004) (noting, in the context of the outpatient prospective payment system, "the havoc that piecemeal review of OPPS payments could bring about," explaining that "judicially mandated changes in one payment rate would affect the aggregate impact of the Secretary's decisions by requiring offsets elsewhere, and thereby interfere with the Secretary's ability to ensure budget neutrality in each fiscal year").

The Preclusion Provision itself reinforces the conclusion that Congress did not mean to confine preclusion to challenges directed at the budget neutrality "step" in the process for determining budget neutral payment rates. Had Congress intended such a limit, it surely would (at a minimum) have referenced that "step" in the Preclusion Provision itself, for example, by cross-referencing § 1395ww(d)(2)(F), the sub-paragraph incorporating the budget neutrality adjustment "step" into the statutory process for computing payment rates for FFY 1984, and § 1395ww(d)(3)(C), the corresponding sub-paragraph for FFY 1985. It did not do so. Instead, it defined the scope of preclusion by cross-referencing § 1395ww(e)(1), the provision that more generally establishes and defines the budget neutrality adjustments and their intended results. This signals Congress's intent to preclude all challenges that would have the effect of negating, interfering with, or otherwise undoing the Secretary's adjustments under § 1395ww(e)(1)(B). This interpretation is also in keeping with how the D.C. Circuit understands the expansive preclusive language used in the provision. *See Texas All.*, 681 F.3d at 409 (finding that similar Medicare statute preclusion provision "manifest[s] . . . Congress's intent to 'proceed with these initial administrative processes without risk of litigation blocking the execution of the program'") (quoting *Cardiosom, LLC v. United States*, 656 F.3d 1322, 1326 (Fed. Cir. 2011)).

By the same token, the statute also makes clear that Congress was not concerned about preserving the reviewability of calculations *related* to the budget neutrality adjustment, such as the cost-per-discharge calculation under § 1395ww(d)(2)(A) or the unadjusted standardized amounts under § 1395ww(d)(2)(D). To the contrary, the budget neutrality provision at issue here expressly instructed the Secretary to modify the standardized amounts themselves in order to achieve budget neutrality, thereby making clear that the budget neutrality adjustment supersedes any antecedent standardized amount calculations. In this scheme, it is implausible to suppose that Congress would have prioritized reviewability of standardized amounts over the Secretary's efforts to maintain budget neutrality. Indeed, for these initial, transitional years of the IPPS, FFYs 1984 and 1985, Congress made clear that the budget neutrality requirements of § 1395ww(e)(1), superseded all payment-related calculations across the entire IPPS—not just to the Federal Portion of payments at issue here, 42 U.S.C. § 1395ww(e)(1)(B), but also to the Hospital Specific Portion, *id.* § 1395ww(e)(1)(A). Far from being merely a "discrete, interim step" that is "within" the process of computing standardized amounts, Pls.' MSJ Mem. at 22, the budget neutrality requirements of § 1395ww(e)(1) establish an overarching constraint to which other calculations must yield.

Finally, the legislative history confirms what the text and structure and purpose of the statute already make clear, namely, that preclusion is not limited to challenges expressly directed at the budget neutrality adjustments themselves but applies to other challenges that are inextricably intertwined with those adjustments. The House Committee Report accompanying Pub. L. 98-21 explains the preclusion provision as follows:

> With respect to administrative and judicial review, your committee's bill would permit review *except in the narrow cases necessary to maintain budget neutrality* and avoid adversely affecting the establishment of the diagnostis related groups, the methodology for the classification of discharges within such groups, and the appropriate weighting of such groups.

H.R. Rep. No 98-25, at 143 (1983), *as reprinted in* 1983 U.S.C.C.A.N. 219, 362 (emphasis added). In other words, the provision bars review to the extent that is "necessary to maintain budget neutrality" for the 1984/1985 fiscal years, without confining the scope of preclusion to any particular "step" in the process of calculating FFY 1984/1985 IPPS payment rates.[6]

### D.    Plaintiffs Provide No Basis to Set Aside the Board's Dismissal Decision

Plaintiffs make various arguments urging the Court to set aside Board's application of the Preclusion Provision.  They are all meritless.

#### 1.    The Preclusion Provision is not limited to "direct" challenges to the budget neutrality adjustment

Plaintiffs devote a significant portion of their brief to arguing that the provision at issue bars review only of "direct" challenges to the budget neutrality adjustments for FFYs 1984 and 1985.  Pls.' MSJ Mem. at 26; *see also id.* at 21-29.  In plaintiffs' view, the provision is not even potentially applicable where the challenged actions are closely related to the budget neutrality adjustments but are not the adjustments themselves, *id.* at 21-26, or where plaintiffs only seek reimbursement for fiscal years *after* FFYs 1984 and 1985, *id.* at 26-29.  These arguments are contrary to the plain language of the statute and the governing case law.  As discussed above, the D.C. Circuit has repeatedly held that provisions of this sort do *not* just preclude "direct" challenges to the agency action identified in the provision.  Rather, the provisions "extend far enough to

---

[6]    In purporting to rely on the same legislative history, plaintiffs focus on the word, "narrow," without seeming to appreciate the implications of the entire phrase.  Pl. MSJ at 25-26. The use of the word "narrow" in this context does not support plaintiffs' suggestion that Congress meant to permit review of challenges to actions inextricably intertwined with the budget neutrality adjustment.  Moreover, as discussed *infra* 32-34, plaintiffs' arguments about unduly broad preclusion are meritless.

prevent *indirect* challenges to agency decisions that Congress expressly shielded from review." *Mercy Hosp.*, 891 F.3d at 1066-67 (emphasis added) (citing *Florida Health*, 830 F.3d at 519).

The "dispositive issue" is not whether plaintiffs challenge the unreviewable action "directly" but "whether the challenged [action is] inextricably intertwined with an action that all agree is shielded from review"—here, the Secretary's budget neutrality adjustments for FFYs 1984 and 1985. *Florida Health*, 830 F.3d at 521 (emphasis omitted). Plaintiffs cannot avoid that inquiry by arguing that the budget neutrality adjustment is just a "discrete step" in the "multi-step" statutory process of determining IPPS payment rates, Pls.' MSJ Mem. at 21-26, or that the statutory structure suggests that Congress did not intend the Preclusion Provision to apply to claims relating to fiscal years after FFY 1985, *id.* at 26-29. At best, these arguments go to whether plaintiffs' challenge is "inextricably intertwined" with the unreviewable budget neutrality adjustments. As discussed below, plaintiffs' arguments on that issue are also meritless.

   2.    *Plaintiffs fail to refute the Board's findings about the effect of the budget neutrality adjustments*

The Board's application of the Preclusion Provision rested on its finding that the unreviewable budget neutrality adjustments effectively "fixed the pie" by tying the standardized amount to a fixed reference point that is external to IPPS, thereby preventing subsequent adjustments to the standardized amounts. Plaintiffs do not even address this aspect of the Board's reasoning until the very end of their preclusion arguments. Pls.' MSJ Mem.at 40-41. There, in a single paragraph, plaintiffs assert that Board did not present "evidence, calculations, or detailed analysis to support its assertion." *Id.* Plaintiffs also argue that the "expert report" submitted with their EJR request shows the upward adjustment they seek would have no effect on the budget neutrality adjustments. *Id.* According to the report, "if the Secretary had properly accounted for

transfers in FFY 1984, he would have proportionally increased both the estimated payments under IPPS and the estimated payments under prior law, such that the budget neutrality adjustment factor would have remained unchanged." *Id.* at 41.

Plaintiffs' brief does not elaborate on this assertion or otherwise discuss the contents of their "expert report." And with good reason. The statements in the report are entirely consistent with the Board's finding that budget neutrality is tied to a fixed reference point. Indeed, far from helping their case, the report only highlights the extent to which plaintiffs' challenge is "inextricably intertwined" with the unreviewable FFY 1984/1985 budget neutrality adjustments. The report states that the alleged cost-per-discharge error resulted in a correspondingly erroneous budget neutrality adjustment. First, in asserting that the Secretary's cost per discharge calculation was understated, the report notes that the FFY 1984 budget neutrality adjustment "left the inequality of average costs and payments unchanged, because it suffered from the same failure to distinguish transfers from discharges." AR 001425 (¶ 7 & n.2). In other words, according to the report, the FFY 1984 budget neutrality adjustment failed to correct the erroneously understated cost-per-discharge calculation and standardized amounts, and instead perpetuated the alleged error by relying on the same purportedly erroneous data as the cost-per-discharge calculation.

Similarly unhelpful to plaintiffs is the report's assertion that "appropriately accounting for transfers" would not have changed the Secretary's FFY 1984 budget neutrality adjustment factor (-3.0%). The assertion about what the Secretary "would have" done rests on the premise that two estimates underlying the Secretary's budget neutrality adjustment (i.e., estimated payments under IPPS and estimated payments under prior law) were *both* erroneously understated (albeit by proportional amounts) as a result of the allegedly understated cost-per-discharge calculation. *See* AR 001425 (¶ 7 & n.2); 001448 (¶¶ 61-62). It does not help plaintiffs to assert that a proper

28

correction of both estimates would leave the adjustment *percentage* unchanged.  To the contrary, having conceded that the adjustment they deem necessary would have required a corresponding correction to the budget neutrality adjustment, plaintiffs' own report has effectively conceded the applicability of the Preclusion Provision.

In any event, plaintiffs' speculation about *how* the Secretary would have made the correction rests on counter-factual speculation about what the Secretary *would have* done if she had "accounted for transfers" in the manner that plaintiffs prefer.  The report cites no support for this claim.  Thus, even if the author of the report had been recognized as an expert by the Board, and he was not,[7] there would be no basis to credit his statement that the percentage would remain unchanged if the Secretary had (in his view) "appropriately" accounted for transfers.  Perhaps more fundamentally, any attempt to assess the author's speculation about what the Secretary "would have" done would require the Board to do exactly what § 1395ww(d)(7) prohibits—evaluate what constitutes a proper "determination of the requirement" and "proportional amount" of the FFY 1984 budget neutrality adjustment.  *See* 42 U.S.C. § 1395ww(d)(7).

Plaintiffs also argue that the Board's conclusion "is not supported by sufficient record evidence."  Pls.' MSJ Mem. at 40-41.  This argument rings hollow, in light of plaintiffs' resistance to the Board's efforts to develop the record, as well as plaintiffs' insistence that there were no factual issues to resolve.  In any event, the Board's conclusion that the budget neutrality

---

[7] As the Board explained, the author of the report has yet to be recognized as an expert and there is significant doubt as to whether he would qualify.  *See* AR 000489-90 (cautioning that under Board Rule 34.2, the "Board does not recognize as an expert any witness whose areas of expertise include legal interpretation of Medicare cost reimbursement issues because it falls within the Board's area of expertise" (emphasis omitted)).  Thus, contrary to plaintiffs' suggestion, the "expert report" was not "evidence" that would matter on any factual issue in dispute.

adjustments "fixed the pie" for FFYs 1984 and 1985 is based largely on its reading of the statute and implementing regulations, which (as the Board explained) tie the adjustment to a "fixed" reference point that is "external" to IPPS—namely, the requirement that aggregate payments for the FFYs 1984 and 1985 should not be "greater than or less than" what would have been paid under prior law.  *See* AR 000473-75 (emphasis omitted).  It was not an "evidentiary" issue.  And contrary to plaintiffs' assertions, the Board did indeed base its conclusion on "detailed analysis." *See id.* 000473-80.  Plaintiffs simply fail to address that analysis in their brief, other than to cite their "expert report" which, as discussed above, does not support their position.[8]

### 3.    *Plaintiffs misapply the applicable case law*

Plaintiffs also dispute the Board's application of controlling D.C. Circuit precedent, arguing that cases like *DCH* and *Mercy Hospital* involved "entirely different and unrelated preclusion provisions" and do not support the Board's "expansive" reading of the Preclusion Provision at issue here.  Pls.' MSJ Mem. at 34-35.  To the contrary, as discussed above, the preclusion provisions applied in those (and other) D.C. Circuit cases employ language that is in all material respects identical to that of the provision at issue here.  *See Florida Health*, 830 F.3d at 518-19 (noting the "virtually identical language" in similar provisions that "unequivocally precludes review" of actions within their scope (quoting *Texas All.*, 681 F.3d at 409)).

Plaintiffs also argue that the provisions here "do not preclude review of the standardized amounts or the resulting final payment rates; they only preclude review of a single step, after the

---

[8] Indeed, as the Board pointed out in its decision, plaintiffs themselves essentially acknowledged in their EJR request that the budget neutrality requirements tie payment rates to a fixed reference point.  AR 000481-83 (discussing plaintiffs' EJR request).  As discussed above, prior to the budget neutrality preclusion provision being raised as a jurisdictional issue, plaintiffs argued in their request that the alleged cost-per-discharge error resulted in IPPS payments that were too low and thus did not comply with applicable budget neutrality requirements.

standardized amounts have been calculated, within the process to calculate those rates just for FFYs 1984 and 1985." Pls.' MSJ Mem. at 36. Plaintiffs in *Florida Health* made essentially the same argument, asserting that a similar provision "creates no bar to a court reviewing the Secretary's ultimate decision, but only her *intermediate* determination as to the estimate of a hospital's share of uncompensated care." *Florida. Health*, 830 F.3d at 521 (emphasis added). The D.C. Circuit rejected the argument, calling it a "distinction without a difference." *Id.* Again, what matters is whether the challenged action is inextricably intertwined with the unreviewable action, "regardless of where that action lies in the agency's decision tree."[9] *Id.*

Plaintiffs' reliance on *American Clinical Laboratory Association v. Azar* ("*ACLA*"), is likewise misplaced. The *ACLA* court found that a provision barring review of "the establishment of payment amounts" did not also bar challenges to a rule that implemented a data collection process established in the same statute. *Am. Clinical Lab'y Ass'n v. Azar*, 931 F.3d 1195, 1204 (D.C. Cir. 2019). In finding that the statute was "reasonably susceptible" to the plaintiffs' interpretation, however, the D.C. Circuit expressly relied on the statute's "bifurcated structure," which indicated a Congressional intent to distinguish the data collection process from the unreviewable establishment of payment amounts. *Id.* at 1207-1208 (citation omitted). The data collection process was an entirely separate process, distinct from the process for establishing payment amounts, and it was set forth in a separate subsection of the statute, with its own set of rules. *See id.* at 1205-1207. In addition, the data collection provisions of the statute imposed

---

[9] Contrary to their suggestion, the "steps" involved in calculating the inaugural FFY 1984 IPPS payment rates are not set forth in different "subsections" of the statute, nor are they "independent" of one another. Pls.' MSJ Mem. at 22-23. Rather, as discussed above, the process is set forth in a single subsection, and a single paragraph within that subsection— paragraph (d)(2). Far from being independent, the steps are inter-related, with each step building on the prior step. The same is true of the process for calculating the FFY 1985 rates.

separate confidential reporting obligations on private parties, subjected them to monetary penalties for non-compliance, and required the Secretary to establish the parameters of that collection process through a separate notice-and-comment rulemaking requirement.  *See id.* at 1199, 1205, 1207.  This case could not be more different.  The challenged actions here are *not* the subject of a separate process, under a separate subsection with separate rules.  Nor do they involve separate notice-and-comment requirements or impose distinct legal obligations and penalties on private parties.  To the contrary, as discussed above, the challenged actions are conjoined with the unreviewable actions as inter-related steps in a single, unitary process that (for each FFY) is set forth in a single paragraph within subsection 1395ww(d).  *See* 42 U.S.C. § 1395ww(d)(2)(for FFY 1984) & (d)(3)(for FFY 1985).

For similar reasons, plaintiffs are wrong to rely on the Board's purported failure to consider the presumption of reviewability.  Pls.' MSJ Mem. at 30-31.  As discussed, the governing D.C. Circuit decisions—which the Board relied on in its decision—make clear that the presumption is overcome by the "specific and emphatic" preclusive language here.  *Texas All.*, 681 F.3d at 408-409; *see also DCH*, 925 F.3d at 505-506; *Mercy Hosp.*, 891 F.3d at 1065-67.  And since this case, unlike *ACLA*, does not involve a statute that is "reasonably susceptible" to a reading that would permit review, the presumption of reviewability is inapplicable.

Finally, plaintiffs' reliance on *American Hospital Association* is also misplaced.  *See* Pl. MSJ Mem. at 36-38 (citing *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724 (2022) ("*AHA*")).  That case, which involved a challenge to the Secretary's methodology for setting certain outpatient prescription drug rates, did not address an argument that the action challenged was "inextricably intertwined" with the unreviewable action.  The Supreme Court concluded that the preclusion provision there barred review of the rate-setting methodology for services other than prescription

drugs, a methodology that was set forth in different provisions from the provision establishing the methodology applicable to prescription drug rates. *See id.* 733-34. The discussion of budget neutrality in AHA is similarly inapplicable here. In *AHA*, the Court noted the parties' dispute over whether any remedy would need to be budget neutral, but expressly concluded that it "need not address potential remedies." *See Am. Hosp.*, 596 U.S. at 733-34. In any event, permitting review here is not merely "impractical," *see id.*, it is flatly contrary to Congress's mandate that the Secretary has the final word on budget neutrality.

### 4.    *Plaintiffs' arguments about the scope of preclusion are meritless*

Lacking support in the governing case law, plaintiffs argue that the Board's interpretation of the Preclusion Provision is too broad because it precludes challenges to the FFY 1984/1985 standardized amounts, and purportedly allows a "narrow jurisdictional exception to swallow the rule." Pls.' MSJ Mem. at 31-38. This argument also fails. Plaintiffs cite nothing to support their suggestion that Congress intended to prioritize the reviewability of FFY 1984 and 1985 standardized amounts over the need to maintain budget neutrality in those fiscal years. As discussed above, the statute makes clear that Congress's priorities were exactly the other way around.[10]

Plaintiffs assert that if Congress had wanted to preclude review of the FFY 1984/1985 standardized amounts or the cost-per-discharge calculation, it would have expressly said that in the Preclusion Provision. Pls.' MSJ Mem. at 31, 36, 37. But this argument misses the point of the provision, which is not to preclude review of standardized amounts, *as such*, but to prevent

---

[10]    As with much of their brief, plaintiffs' argument rests on the false premise that the budget neutrality adjustment is merely a discrete "step" in a process for computing FFY 1984/1985 standardized amounts, rather than an overarching requirement applicable to the entirety of the IPPS payment system for FFYs 1984 and 1985. *See* Pls.' MSJ Mem. at 20-26.

interference with the Secretary's efforts to maintain *budget neutrality* for FFYs 1984 and 1985, as required by § 1395ww(e)(1). Given that purpose, it makes perfect sense that the provision would focus specifically on the budget neutrality adjustments set forth in § 1395ww(e)(1), and not on related computations that might affect the adjustment. Congress could not be expected to anticipate and specify in advance every type of challenge that might entail improper review of those adjustments, especially because budget neutrality requirements extend beyond the calculation of FFY 1984/1985 IPPS payment rates at issue here and encompass the calculation of budget neutral "hospital specific" portion as well. *See* 42 U.S.C. § 1395ww(e)(1)(A).

For similar reasons, plaintiffs' professed concerns about the Board's "expansive" reading of the Preclusion Provision are also baseless. First, plaintiffs' concerns would be relevant here only if plaintiffs had presented a plausible alternative reading of the Preclusion Provision, and they have not done so. The only interpretation they propose would limit preclusion to "direct" challenges to the budget neutrality adjustment, which, as discussed above, is contrary to the law of this Circuit. Second, as also discussed above, the Board's application of the Preclusion Provision here is not overly broad. It is exactly commensurate with the text of the statute and with Congress's obvious purpose in precluding all administrative and judicial review of the Secretary's efforts to achieve budget neutrality under § 1395ww(e)(1). It would have made little sense to prohibit review of the Secretary's budget neutrality adjustments but then authorize judicial review of challenges that would negate the effect of those adjustments.

Moreover, plaintiffs vastly overstate the breadth of the Board's interpretation and its potential significance for future challenges. The Preclusion Provision forecloses review of standardized amount challenges only where, as here, they would be tantamount to challenges to the budget neutrality adjustments for the first two fiscal years of IPPS—FFY 1984 and FFY 1985.

34

And given that FFYs 1984 and 1985 were transition years that gradually phased in the IPPS payment system, IPPS payment rates (and the standardized amount on which they were based) only affected 25% of hospital payments for FFY 1984 and only 50% for FFY 1985.  *See Washington Hospital*, 795 F.2d at 142.  Notably, for all their professed concerns about overbreadth, plaintiffs identify only two other cases over the past *four decades* that, in their view, would be subject to dismissal under the Board's "expansive" interpretation.  Pls.' MSJ Mem. at 32 (citing *HCA Health Servs. of Tenn., Inc. v. Thompson*, 207 F. Supp. 2d 719 (M.D. Tenn. 2002), and *Saint Francis Med. Ctr. v. Azar*, 894 F.3d 290 (D.C. Cir. 2018)).[11]

Nor is there a basis for concern that the Board's interpretation reflects an "unprecedented" expansion of the Preclusion Provision.  None of plaintiffs' cited "precedents" upheld a challenge to the 1984/1985 standardized amounts, so the applicability of the Preclusion Provision made no difference to the outcome.  And the only decision to address the provision at any length was the Board's own prior decision in *Columbia/HCA v. BCBS*, PRRB Dec. No. 2000-D74 (Aug. 18, 2000), which found the provision did not bar review of a challenge to the 1984/1985 standardized amounts and underlying 1981 data.  *See* Pls.' MSJ Mem. at 33.  But the Board in this case expressly considered its earlier interpretation and correctly found that it had "erred" in *Columbia/HCA*, pointing out that the Board in that case had expressly acknowledged that the requested adjustment would require a correction to the budget neutrality adjustment.  *See* AR 000487-88 n.51.

---

[11]  Contrary to plaintiffs' suggestion, the *Saint Francis* case did not implicate the Preclusion Provision because the merits of the cost-per-discharge claim were not before the Court.  *See infra* 37-38.

5. *Plaintiffs cannot avoid preclusion by seeking relief pertaining to fiscal years after FFY 1985*

Finally, the Court should reject plaintiffs' assertion that the Preclusion Provision should not apply because they are not seeking relief regarding the FFY 1984/1985 budget neutrality adjustments, and that the "requested relief affects only FY 2019, the year on appeal." Pls.' MSJ Mem. at 38-39. This argument essentially rehashes their erroneous position that only "direct" challenges to the FFY 1984 and FFY 1985 budget neutrality adjustments fall within the scope of the Preclusion Provision. *See Id.* at 26. Plaintiffs' decision to wait until many years after the fact to seek relief on a challenge to the FFY 1984/1985 standardized amounts does not make their claim any more reviewable than it would have been if plaintiffs had asserted it in a timely and direct challenge in 1984 or 1985. While they may be seeking reimbursement only for FFY 2019, their claimed entitlement to such relief is entirely dependent on the assertion that the FFY 1984 and 1985 standardized amounts were unlawfully understated as a result of the allegedly erroneous cost-per-discharge calculation. That claim clearly implicates the validity of the budget neutrality adjustments. It makes no sense to think that Congress, having categorically prohibited all challenges to the FFY 1984/1985 budget neutrality adjustments, nonetheless meant to allow such challenges as a basis for relief pertaining to subsequent FFYs.

In any event, it is not accurate to say the relief plaintiffs seek affects only FFY 2019. The relief sought—an upward adjustment carried forward to the FFY 2019 standardized amounts— would (and is intended to) undo the allegedly ongoing effects of "unlawfully understated" FFY 1984/1985 standardized amounts. While plaintiffs do not seek *reimbursement* for FFY 1984 or FFY 1985, they do seek a retroactive adjustment to the standardized amounts for those FFYs that would be "carried forward" through to their FFY 2019 standardized amounts. The relief sought

36

would also undo the allegedly ongoing effects of budget neutrality-adjusted standardized amounts that were "carried forward" in years after FFY 1985. *See* Pls.' MSJ Mem. at 29 n.9.

Seeking to avoid this last problem, plaintiffs argue that Congress did not intend the budget neutrality adjusted standardized amounts to be carried forward in subsequent years, and that this purportedly demonstrates that Congress could not have intended the Preclusion Provision to apply to claims pertaining to fiscal years after FFY 1985. Pls. MSJ Mem. at 39-40. It demonstrates no such thing. If Congress did not anticipate that the Preclusion Provision would apply to fiscal years after FFYs 1984 and 1985, it is only because there is no basis in the Medicare statute for claims of the sort raised by plaintiffs here, which seek relief *for FFY 2019* based on alleged errors in standardized amounts computed *for FFYs 1984 and 1985*. *See infra* 38-41. In any event, plaintiffs' argument about Congressional intent does not change the effect of the relief they seek. As plaintiffs concede in a footnote, the Secretary did carry forward the budget neutrality adjusted amounts for FFY 1985. Pls.' MSJ Mem. at 29 n.9. In so doing, she did not agree that the statute, in its then-current form, precluded her from doing so, and she explained her reasoning for that conclusion. *See* 50 Fed. Reg. at 35,697.[12] In any event, plaintiffs' challenge to the FFY 1984/1985 standardized amounts falls squarely within the scope of the Preclusion Provision even without considering the budget neutrality adjusted amounts carried forward, as discussed above.

---

[12] To the extent plaintiffs now seek to challenge (in a footnote) the Secretary's decision to carry forward these amounts as "contrary to the statute," *see* Pls.' MSJ Mem. at 29 n. 9, any such challenge is waived because plaintiffs did not raise it before the Board. *Nat'l Ass'n of Mfrs. v. U.S. Dep't of Interior*, 134 F.3d 1095, 1111 (D.C. Cir. 1998) ("'Our cases ... require complainants, before coming to court, to give the [agency] *a fair opportunity* to pass on a legal or factual argument.'" (alteration & omission in original) (quoting *Wash. Ass'n for Television & Child. v. FCC*, 712 F.2d 677, 681 (D.C. Cir. 1983))); *see also Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1298 (D.C. Cir. 2004). In any event, plaintiffs do not address the Secretary's explanation for her decision in the Federal Register. *See* 50 Fed. Reg. at 35,697.

**II.    The Court Has No Jurisdiction to Review the Merits of Plaintiffs' Claims Under the *Ultra Vires* Doctrine or Otherwise**

Plaintiffs argue, in the alternative, that there is jurisdiction under the *ultra vires* doctrine. But this extremely narrow doctrine "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).  It cannot apply unless: "(i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Id.* at 449 (cleaned up).  The third requirement covers only "extreme" agency error.  *Griffith v. Fed. Lab. Rels.Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988). Plaintiffs fail to meet the first and third requirements.

**A.    The *Ultra Vires* Doctrine Does Not Apply Because Congress Expressly Precluded Review**

First, the preclusion of review here is express, not implied, so the *ultra vires* doctrine is inapplicable.  Plaintiffs' own cited authority confirms that this is the case.  *See DCH*, 925 F.3d at 509 (finding a similarly-worded preclusion provision under the Medicare statute to be "express" for purposes of the *ultra vires* doctrine).  Plaintiffs argue that the preclusion of review here is not express because, in their view, their claim does not fall within the "express" terms of the preclusion provision.  Pls.' MSJ Mem. 42.  This argument is merely a rehash of their erroneous argument (addressed above) that the preclusion provision does not clearly apply here.

**B.    Plaintiffs Cannot Show Error, Let Alone the Sort of "Extreme" Error Required Under the *Ultra Vires* Doctrine**

Plaintiffs also do not plausibly allege error—much less "extreme" agency error—in the computation of their FFY 2019 standardized amounts.  Relying heavily on the D.C. Circuit

decision in *Saint Francis*, plaintiffs assert that those amounts are unlawfully understated because of the allegedly erroneous "predicate fact" determined in 1983—the costs-per-discharge calculation under § 1395ww(d)(2)(A), which allegedly failed properly to distinguish "discharges" from "transfers." 894 F.3d at 293. But *Saint Francis* did not consider (much less endorse) the *merits* of that challenge. The merits were not before the court because the claim had been jurisdictionally dismissed under the agency's reopening regulation. *See id.* The sole issue before the court was whether the reopening regulation, which imposed a 3-year time limit on "predicate fact" challenges, also applied to cases on direct appeal to the Board. *See id.* (finding that the regulation did not apply on such direct appeal because such appeals are not the same thing as reopenings). The court's passing discussion of the cost-per-discharge challenge simply provided relevant context for its analysis of that issue. *See id.*

A closer examination of plaintiffs' claim now makes clear that it is meritless in numerous respects. First, plaintiffs have not explained how any purported error in the 1983 calculation could be legally relevant to the validity of their FFY 2019 standardized amounts. Under the text of the statute, the costs-per-discharge "predicate fact" is relevant *only* to the computation of standardized amounts for *FFY 1984*, as provided in paragraph (2) of § 1395ww(d). *See* 42 U.S.C. § 1395ww(d)(2)(A). By contrast, the starting point for the computation of every subsequent FFY's standardized amount—an inquiry governed by paragraph (3)—is "the average standardized amount *computed* for the previous fiscal year." *Id.* § 1395ww(d)(3)(A) (emphasis added). In other words, as the D.C. Circuit has emphasized, the Secretary does not calculate the standardized amount "from scratch" in fiscal years *after* FFY 1984. *Cape Cod*, 630 F.3d at 205. Rather, he starts with the standardized amount for the immediately preceding fiscal year as it was in fact

39

"computed"—without revisiting the accuracy or validity of the prior computations.  *See* 42 U.S.C.
§ 1395ww(d)(3)(A).

Plaintiffs cite no support for their claim that the Secretary should now be compelled to do
the opposite—i.e., to go back 40 years and, contrary to Congress's directive, recalculate
standardized amounts "from scratch" on the basis of 1981 data—all for the purpose of carrying
forward changes in subsequent FFYs.[13]  Nor is there any reason to think Congress intended that
result, particularly given the iterative process contemplated in the statute, and the need of Congress
and the Secretary to be able to make corrections, updates, and adjustments with predictable
effects.[14]  *See also*, *e.g.*, *HCA Health.*, 207 F. Supp. 2d at 727-28 (M.D. (observing that "Congress
neither required the Secretary to, nor prohibited him from, 'correcting' the PPS rate because of
flaws in the [1981 cost reporting] data"); *see id.* (observing that it would be "absurdly burdensome"
to require the Secretary to "correct" the IPPS rate every time hospitals identify some flaw in the
1981 cost reporting data).

---

[13] As explained above, *Saint Francis* did not consider the merits of the underlying claim,
so plaintiffs' reliance on *dicta* from the background section of that opinion is unavailing.  The
*Kaiser* decision is likewise inapplicable.  *See Kaiser Found. Hosps. v. Sebelius*, 708 F.3d 226,
228 (D.C. Cir. 2013).  Unlike the cost-per-discharge calculation challenged here, the "predicate
fact" at issue in *Kaiser* (the number of "full-time equivalent" residents" or "FTEs" determined
for a pre-1997 period) was not just relevant to reimbursement in the baseline period, but also to
reimbursement in all subsequent years.  *See id.* (explaining that, under 42 U.S.C.
§ 1395ww(h)(4)(F), the number of FTEs for the hospital's pre-1997 cost period was used to
determine reimbursement in any "cost-report periods beginning on or after October 1, 1997").
Nor do Plaintiffs explain their conflation of "predicate facts" claims in *Saint Francis* and *Kaiser*
with the "inextricably intertwined" standard for determining whether Congress has precluded
judicial review.  *See* Pls.' MSJ Mem. at 38.  Neither *Kaiser* nor *Saint Francis* addressed a
statutory preclusion of administrative and judicial review.

[14] In Appendix A to its decision, the Board listed "examples of other adjustments to the
standardized amounts" that had occurred outside of the FFYs 1984 and 1985 budget neutrality
adjustments.  *See* AR at 494-500.  Significantly, the appendix lists several congressional actions,
including two amendments to the Social Security Act in 1994 and 1997 (see AR at 495-96).

Second, plaintiffs have not shown that the 1983 calculation itself violated the statute. They assert that the Secretary violated "[t]he plain terms of § 1395ww(d)(2)(A)" because the 1981 cost reporting data treated "transfers" as "discharges." Pls.' MSJ Mem. at 42-43. *See also id.* at 5-7. But the term, "discharge," is clearly broad enough to encompass a transfer from one hospital to another. Indeed, the Secretary construed the term that way for years under the reasonable cost system, which is why the 1981 data did not distinguish transfers from other kinds of discharges. *See* 49 Fed. Reg. at 245. In any event, the Secretary reasonably explained why any discrepancy with the new definition of "discharge" would have no significant effect on rates.[15] *See* 49 Fed. Reg. at 245-46. The Secretary was not required to filter out every conceivable imperfection in the data, which was unaudited and inherently uncertain because the statute required use of the "most recent" data available, 42 U.S.C. § 1395ww(d)(2)(A) and required the Secretary to act quickly. *HCA Health*, 207 F. Supp. 2d at 727-30 (explaining, *inter alia*, that given Congress's "expedited implementation" schedule and "inherent uncertainties of the available data," Congress did not require "perfect mathematical exactitude" in the costs-per-discharge calculation).

---

[15] Plaintiffs' arguments on this issue rest largely on "apples to oranges" comparisons. Plaintiffs argue that the calculation was inconsistent with the Secretary's decision to pay transfers less under IPPS. But the Secretary explained why, in her view, treating transfers like other discharges for purposes of setting rates would not likely have significant effect on those rates, and she also explained why, in the context of determining payment to particular hospitals going forward, it made sense to refine the definition of "discharge" so as to avoid large, unjustified payouts to individual hospitals. 50 Fed. Reg. at 246. Plaintiffs do not address the Secretary's explanation for the distinction. Plaintiffs' attempt to show inconsistency based on the implementation of capital IPPS is also misguided. The Secretary's 1991 actions in implementing capital IPPS years later do not present a situation analogous to the Secretary's determination of FFY 1984 IPPS payment rates. Pls.' MSJ Mem. at 7-8. For example, the Secretary was using different data that itself distinguished between discharges and transfers for Medicare payment purposes, and the discussion plaintiffs cite was addressing the hospital specific rate, not the federal rate. 56 Fed. Reg. 43,358, 43,386-87 (Aug. 30, 1991).

Finally, even if there were an error in the 1983 calculation, and even if that calculation were potentially "relevant" to standardized amounts *after* FFY 1984, plaintiffs have not plausibly alleged that any such 1983 error did, in fact, ultimately result in an erroneously understated standardized amount *for FFY 2019*. It is not enough simply to assert that the purported error had an "effect" on the FFY 1984 standardized amount and then had a "carry-forward" effect on future standardized amounts. Compl. ¶ 2. Plaintiffs must show that the alleged understatement was not offset by *overstatements* in the unaudited 1981 cost reporting data,[16] and that in being "carried forward" year-after-year for 35 years, the allegedly understated amounts *remained* understated—notwithstanding intervening adjustments and corrections made over the years by Congress and the Secretary.[17] Plaintiffs resisted the Board's efforts to develop a record on these issues, brushing them aside as questions for some future "damages" calculation. See, e.g., AR 000905-906, 000909. *See also* Compl. ¶ 59 n.6. Plaintiffs are wrong. Absent some factual showing that the alleged 1983 error somehow adversely affected the FFY 2019 standardized amount 35 years later, plaintiffs cannot establish an unlawful understatement, or for that matter, Article III standing to

---

[16] As the Board also explained, the standardized amounts at issue were found to be significantly overstated, and by a factor that would more than offset plaintiffs' estimated effect of any costs-per-discharge error. In the FFY 1986 IPPS final rule, the Secretary found that the standardized amounts for FFY 1985 had been overstated and that the budget neutrality adjustment factors resulted in standardized amounts that were higher than necessary to achieve budget neutrality. The Secretary cited a Government Accountability Office ("GAO") report, which also found that the standardized amounts originally calculated were overstated by as much 4.3% because they were based on unaudited cost report data and included elements of capital costs. AR 000496-500 (discussing 50 Fed. Reg. 35,695).

[17] Such intervening events would include the FFY 1984/1985 budget neutrality adjustments themselves, which reduced standardized amounts by -3% and -5%, respectively, and thus would have rendered moot their alleged 0.65% cost-per-discharge error. As the Board pointed out, moreover, see AR 000491, there have been other adjustments to the standardized amounts, some of which are identified in Appendix A to the Board's decision, AR 000494-500.

assert their claim.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Plaintiffs have not even plausibly alleged these things.

## III.    The Court Should Not Retain Jurisdiction or Impose Deadlines If It Remands

Plaintiffs assert that if the Court remands, it should retain jurisdiction and instruct the agency to take specific actions within certain time limits.  Such relief would be improper—even if the Court were to grant plaintiffs' summary judgment motion.  "Under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded for further action consistent with the corrected legal standards."  *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995) (collecting cases).  "'Only in rare . . .  cases does the court direct the agency how to resolve a problem' rather than simply pointing out the legal error and leaving its resolution up to the agency."  *Allina Health Servs. v. Azar*, No. CV 16-150 (RC), 2020 WL 7042869, at *1 (D.D.C. Jan. 2, 2020) (omission in original) (citation omitted).  Plaintiffs do not argue that this is the "rare" case where additional relief is warranted nor is there any basis for such an argument.  *See id.*; *Mercy Gen. Hosp. v. Azar*, 410 F. Supp. 3d 63, 82 (D.D.C. 2019) (citing cases).

Nor could they.  Retaining jurisdiction and imposing time limits would be particularly inappropriate here because the Board has expressly stated that if its jurisdictional ruling were set aside, the record would require further development as to the plaintiffs' challenge.  AR 000499-89, 000493. The Board explained that it had "concerns that the Providers are oversimplifying the alleged nature of effect of the FFY 1984 standardized amounts issue **on the FFY 2019 standardized amounts**."  AR 000488.  "Accordingly, the Board believes that the record needs further development as to the alleged nature of the Providers' alleged injury."  AR 000488-89.  To

consider granting EJR, therefore, would be "premature."[18]  AR 000493.  Plaintiffs offer no sound

reason for the Court to disagree with that judgment.

## CONCLUSION

For these reasons, the Secretary respectfully asks the Court to deny plaintiffs' motion for

summary judgment and to grant the Secretary's cross-motion for summary judgment.


Dated: June 7, 2024                                Respectfully submitted,

                                                   BRIAN M. BOYNTON
                                                   Principal Deputy Assistant Attorney General

                                                   ERIC BECKENHAUER
Of Counsel                                         Assistant Branch Director
                                                   Civil Division
SAMUEL R. BAGENSTOS
General Counsel                                     /s/ Peter M. Bryce

JANICE L. HOFFMAN                                  PETER M. BRYCE
Associate General Counsel                          Illinois Bar No. 6244216
                                                   Senior Trial Counsel
SUSAN MAXSON LYONS                                 United States Department of Justice
Deputy Associate General Counsel                   Civil Division, Federal Programs Branch
for Litigation                                     1100 L Street, NW, Room 11106
                                                   Washington, D.C. 20005
ALEXANDER R. WHITE                                 Tel: (202) 616-8335
Attorney                                           Fax: (202) 616-8470
                                                   E-mail: peter.bryce@usdoj.gov

*United States Department of Health &*
*Human Services*                                   *Attorney for Defendants*

---

[18] Contrary to plaintiffs' suggestion, the MAC did not "concede[]" that all hospitals otherwise met the requirements for Board review, Pls.' MSJ Mem. at 17, but rather merely said that "to date no procedural issues have surfaced."  AR 001951.  Notably, moreover, the Board pointed out that there have been other threshold and as yet unresolved challenges raised in some of the appeals at issue here.  *See* AR 000493 n.64 (noting that the MAC had filed certain challenges under 42 C.F.R. § 405.1873).