## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **ST. MARY'S REGIONAL MEDICAL CENTER**, *et al.*, <br><br> *Plaintiffs,* <br><br> **v.** <br><br> **XAVIER BECERRA**, <br> Secretary of Health and Human Services, <br><br> *Defendant.* | Case No. 1:23-cv-1594-RCL |

## <u>MEMORANDUM OPINION</u>

Beginning in 1983, pursuant to a statutory directive, the Secretary of Health and Human Services (the "Secretary" or "defendant") implemented a new scheme for compensating inpatient hospitals that provide services to Medicare beneficiaries. The revised model is known as the Inpatient Prospective Payment System ("IPPS"). Congress provided a multi-step methodology for the execution of this new payment framework, requiring the Secretary to make certain discrete calculations in a specific sequence. The plaintiffs, a group of hospitals that serve Medicare beneficiaries, allege that the Secretary miscalculated certain figures, called the "standardized amounts," during his initial implementation of IPPS. Because each subsequent year's standardized amounts are based in part on the previous year's figures, the plaintiffs claim that the Secretary's error in calculating the inaugural standardized amounts continues to result in depressed payments even to the present day.

In 2019, the hospitals filed administrative appeals with the Provider Reimbursement Review Board (the "PRRB" or "Board"), an agency tribunal for Medicare compensation challenges, seeking recalculation of their payments for that fiscal year based on this theory of

underpayment.  Importantly, they do *not* seek any compensation for alleged underpayment during the fiscal years between 1984 and 2019, years that are now "closed" to such a challenge.

In 2023, the PRRB dismissed the appeals, holding that the Board lacked subject matter jurisdiction to adjudicate them.  Specifically, the PRRB held that certain provisions in the IPPS statute preclude judicial or administrative review of the challenged calculations.  Shortly thereafter, the plaintiffs sued in this Court to challenge the PRRB's adverse jurisdictional determination.  They ask this Court to set aside the PRRB's decision, declare that the hospitals have been unlawfully undercompensated, and order the Secretary to correctly recalculate their fiscal year 2019 payments.  Both parties have moved for summary judgment.

For the reasons contained herein, the Court will **GRANT IN PART AND DENY IN PART** the plaintiffs' Motion for Summary Judgment, **DENY** the Secretary's Motion for Summary Judgment, and **REMAND** the dispute along with an Order for periodic status reports.

## I.    Statutory Background

In order to provide necessary context for this dispute, which involves a complicated statutory and administrative scheme, the Court begins with a brief foray into the "labyrinthine world of Medicare . . . ." *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 694 (D.C. Cir. 2014). Medicare is a federal program which provides health insurance for elderly and disabled Americans, administered by the Secretary of Health and Human Services through an agency called the Centers for Medicare & Medicaid Services ("CMS").  *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1226–27 (D.C. Cir. 1994).  Prior to Federal Fiscal Year 1984 (which began on October 1, 1983), Medicare reimbursed hospitals for the inpatient hospital services that they provided to Medicare beneficiaries based on the "reasonable costs" of treatment actually incurred by the hospital.  *Id.* at 1227 (citing 42 U.S.C. § 1395f(b) (1988)).  Congress eventually

became concerned that this reimbursement model incentivized hospitals to rack up unnecessary treatment expenses. *Id.*

Accordingly, in 1983, the 98th Congress overhauled Medicare's reimbursement structure. *See* Pub. L. No. 98-21, § 601, 97 Stat. 65, 149 (1983). Under the revised system, called the Medicare Hospital Inpatient Prospective Payment System ("IPPS"), Congress tasked the Secretary with setting a schedule of predetermined reimbursement rates each fiscal year, rather than reimbursing hospitals based on their actual costs. Under the IPPS system, each patient is assigned to a "diagnosis-related group" ("DRG"), a category which reflects the condition(s) with which they have been diagnosed. 42 U.S.C. § 1395ww(d)(4). Each DRG corresponds to a numerical "weight," which reflects the ratio of the average hospital's cost-per-discharge to treat a patient within that DRG to the average cost-per-discharge of the broader Medicare patient population.[1] Recognizing that some fraction of treatment costs is dependent on the local cost of labor, Congress also required the Secretary to calculate the share of treatment costs that are labor-dependent and scale that share up or down, depending on the cost of labor in the United States as a whole and in each region of the country—that is, each of the nine divisions used in the U.S. Census—further subdivided into "rural" and "urban" settings, for a total of twenty geographic units. Congress also wished to ensure that the migration to IPPS would not cause a sudden surge in costs, so it required the Secretary to make certain predictions and adjustments so that the new system would be just as expensive in its first two years, fiscal years 1984 and 1985, as the "reasonable costs" model would otherwise have been. 42 U.S.C. § 1395ww(e)(1)(b).

---

[1] As an illustration: in the 2024 Final IPPS Rule, the DRG weight for "angina pectoris" was 0.6981, reflecting a condition that is relatively inexpensive to treat—about 30% less expensive than the average Medicare patient's treatment. By contrast, a "lung transplant" receives a weight of 12.2664, reflecting a procedure that is vastly more expensive than the treatment which an average Medicare patient receives. *See* Centers for Medicare and Medicaid Services, *Table 5: MS-DRGs, Relative Weighting Factors*, https://www.cms.gov/medicare/payment/prospective-payment-systems/acute-inpatient-pps/fy-2024-ipps-final-rule-home-page.

Congress prescribed a specific, step-by-step approach for the Secretary to implement each of these requirements for fiscal year 1984, the inaugural year of IPPS, which is described in 42 U.S.C. § 1395ww(d)(2).  Specifically, Congress directed the Secretary to:

- Step One: Calculate each inpatient hospital's "allowable operating costs per discharge of inpatient hospital services," based on the "most recent cost reporting period for which data are available."  42 U.S.C. § 1395ww(d)(2)(A).  In the inaugural IPPS rule, the Secretary determined that the base reporting year would be 1981.  48 Fed. Reg. 39752, 39763 (Sept. 1, 1983).  As the Court will describe in more detail later, this is the step where the plaintiffs claim the Secretary erred, by defining "discharge" too broadly and thus depressing the "allowable operating costs per discharge" ratio.

- Step Two: Update cost-per-discharge data for inflation and patient population changes between the observation year (1981) and 1983, and then further adjust the data based on projected inflation to 1984.  42 U.S.C. § 1395ww(d)(2)(B).

- Step Three: "[S]tandardize" each hospital's adjusted cost-per-discharge figure by controlling for certain hospital-specific factors, such as "indirect medical education costs," wage variations among hospitals, and "case mix," which is a measure of the relative resource-intensity and complexity of a given hospital's patient population.  42 U.S.C. § 1395ww(d)(2)(C).  The outcomes of this calculation are called the "standardized amounts."

- Step Four: "[C]ompute an average of the standardized amounts" for the entire country, as well as an average for the urban and rural subdivisions, respectively,

of each of the nine Census regions.  42 U.S.C. § 1395ww(d)(2)(D).  The outputs of these calculations are referred to as the "average standardized amounts."

- Step Five: Reduce each of the average standardized amounts calculated in the previous step to account for high-cost "outlier payments." 42 U.S.C. § 1395ww(d)(2)(E).

- Step Six: Further adjust each of the average standardized amounts as necessary to achieve budget neutrality for fiscal year 1984. 42 U.S.C. § 1395ww(d)(2)(F).

- Step Seven: Multiply the budget-neutralized amounts from the previous step by the DRG weights, yielding the "DRG prospective payment rate" for each DRG in each region and the country as a whole.  42 U.S.C. § 1395ww(d)(2)(G).

- Step Eight: Determine what share of hospitals' costs are "attributable to wages and wage-related costs," and adjust the wage-related share of those costs up or down by a coefficient reflecting the relative wage level in each geographic area as compared to the national average.  42 U.S.C. § 1395ww(d)(2)(H).  This ratio is referred to as the "wage index."  *See, e.g.*, *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011).

In sum, a hospital's prospective reimbursement for a given patient would be calculated using the following variables: AASA = Adjusted Average Standardized Amount (that is, the average standardized amount in the urban or rural area of whatever region the patient is treated in, after adjustment for outlier payments and budget neutrality), labor% = the share of the AASA attributable to wages and wage-related costs, non-labor% = the share of the AASA *not* attributable to labor-related costs, WI = the applicable wage index, and DRG Weight = the

weight assigned to the patient's diagnosis-related group.   Compensation would then be calculated as follows:

$$\text{Payment} = [(\text{AASA} \times \text{non-labor\%}) + (\text{AASA} \times \text{labor\%} \times \text{WI})] \times (\text{DRG Weight}).$$

*See Cape Cod*, 630 F.3d at 206.[2]  For fiscal year 1985 only, the Secretary was directed to follow an abridged version of this methodology.   Rather than recalculating the standardized amounts from scratch, the statute required the Secretary to begin with the average standardized amounts calculated for the previous fiscal year in step 4, above, and update them for the new fiscal year by accounting for inflation and changes in case mix.  42 U.S.C. § 1395ww(d)(3)(A). Next, the statute directed the Secretary to adjust these updated average standardized amounts for outlier payments, *id.* §1395ww(d)(3)(B), then for budget neutrality, *id.* §1395ww(d)(3)(C), and then multiply by the DRG weights and wage adjustments to arrive at final payment rates for fiscal year 1985.  *Id.* §1395ww(d)(3)(D)–(E).  For fiscal years after 1985, the process would again start with the prior years' average standardized amounts, but as already discussed, the budget neutrality adjustments were halted after the first two years of the new compensation model.   Thus, Congress designed a system under which the national and regional average standardized amounts would "carr[y] forward" year after year, with the preceding year's average standardized amounts providing the starting point for calculating the following year's standardized amounts, up to the present day.  *Cape Cod*, 630 F.2d at 205.

Congress also made several of the Secretary's calculations unreviewable.   42 U.S.C. § 1395ww(d)(7) provides that "[t]here shall be no administrative or judicial review . . . of . . . any adjustment effected pursuant to subsection (e)(1) . . . ."   Subsection (e)(1)(B), in turn,

---

[2] Today, Medicare bases its reimbursement calculations on the national standardized amount, rather than the regional average standardized amounts.  42 U.S.C. § 1395ww(d)(1)(A)(iii).  This change, reflected in *Cape Cod*, is immaterial for purposes of this litigation.

refers to and cross-references the budget neutrality adjustments described in step 6, above. Thus, the combined effect of § 1395ww(d)(7) and § 1395ww(e)(1)(B) is to immunize the Secretary's budget neutrality adjustments from judicial or administrative review. The non-reviewability of the budget neutrality adjustment is also enshrined in the organic statute of the Provider Reimbursement Review Board, the administrative body to which healthcare providers may appeal to challenge a reimbursement determination. That statute provides that "[t]he determinations and other decisions described in section 1395ww(d)(7) . . . shall not be reviewed by the Board or by any court . . . ." 42 U.S.C. § 1395oo(g)(2). Again, § 1395ww(d)(7) does not contain a cross-reference to any other statutory provision of relevance to this dispute; for purposes of the litigation, its sole referent is the budget neutrality adjustments. Finally, CMS's own regulations state that judicial and administrative review is unavailable for budget neutrality adjustments and the creation of DRGs, but do not identify any other aspects of the Secretary's calculations as non-reviewable. 42 CFR § 405.1804. These provisions barring review of the Secretary's budget neutrality adjustments are hereafter referred to as the "Preclusion Provisions."

## II.    St. Mary's Challenge

Since 2005, a coalition of inpatient hospitals has been engaged in a long-running campaign of litigation against the Secretary, challenging CMS's methodology for its inaugural standardized amounts calculation for fiscal year 1984. *Saint Francis Med. Ctr. v. Azar*, 894 F.3d 290, 293 (D.C. Cir. 2018). The plaintiffs allege that, when calculating "allowable operating costs per discharge" in the first step of the IPPS process outlined in 42 U.S.C. § 1395ww(d)(2), the Secretary erroneously counted inter-hospital transfers as "discharges." Pls.' Mot. for Summ. J. 5–6, ECF No. 20-1. The plaintiffs contend that the cost of treating a patient whose treatment culminates in transfer is necessarily lower than what the cost would have been had that hospital treated the patient all the way until final discharge. Therefore, they argue, counting transfers as

discharges in the initial cost-per-discharge calculation depressed the inaugural standardized amounts and, because those original standardized amounts factored into future reimbursement rates through the mechanism described above, has perpetuated chronic underpayment up to the present day. *Id.* at 8–9.

Providers who wish to challenge an "open" payment determination are required to either appeal to the PRRB "within 180 days after notice of" their payment determination, 42 U.S.C. § 1395oo(a)(3), or to request a discretionary "reopening" of their determination within three years. 42 C.F.R. § 405.1885. After those time periods have elapsed, the fiscal year is deemed "closed." Early in the plaintiffs' campaign, the Secretary took the position that CMS regulations forbade the hospitals from challenging "open" Medicare reimbursement determinations based on so-called "predicate facts," which are "factual determinations that are relevant to the payment year at issue, but that were made in earlier [closed] years." *Saint Francis*, 894 F.3d at 292. The plaintiffs' challenge to the inaugural standardized amounts calculation is a paradigmatic "predicate facts" challenge.

In 2013, the D.C. Circuit rejected the Secretary's position, holding that the regulation in question "allows for modification of predicate facts in closed years provided the change will only impact the total reimbursement determination in open years." *Kaiser Found. Hosps. v. Sebelius*, 708 F.3d 226, 232–33 (D.C. Cir. 2013). That is, a provider who identifies an erroneous predicate fact that affects their compensation *cannot* request curative payment for the closed cost years between when CMS committed the error and the open year that is the subject of the provider's appeal or reopening. But the provider *can* seek a corrective recalculation of their compensation for a still-open cost year based on the lingering effects of an erroneous predicate fact, even if the error was committed during a cost year that has long since closed.

In response to the D.C. Circuit's decision, the Secretary amended CMS's reopening regulation specifically to bring predicate fact challenges within the reopening mechanism's three-year limitations period. *Saint Francis*, 894 F.3d 292–93. The Secretary then took the position that the revised reopening regulation's three-year limitation period barred *all* predicate fact challenges to factual determinations older than three years, even when those challenges are raised in the context of an administrative appeal. The D.C. Circuit rejected that argument in 2018, holding that the reopening regulation "does not apply to administrative appeals." *Id.* at 294. That decision opened the door to predicate fact challenges, no matter how long ago the facts were established, so long as the providers raise their challenge in a timely administrative appeal and seek damages only for underpayment during an open cost year. In a concurrence, then-Judge Kavanaugh excoriated the Secretary's efforts to bar predicate fact challenges and circumvent *Kaiser* by regulation. *Id.* at 297–98 ("Saving money is a laudable goal, but not one that may be pursued by using phony facts to shift costs onto the backs of hospitals.").

Shortly after *Saint Francis* was decided, the plaintiffs in this dispute challenged their IPPS payments for fiscal year 2019. Pls.' Mot. for Summ. J. at 12–13. The plaintiffs brought their challenge as five separate timely group appeals to the PRRB, satisfying both Medicare's administrative exhaustion requirement and *Saint Francis*'s guidance for bringing a viable predicate fact challenge. *Id.*; *see* 42 U.S.C. § 1395oo(a)–(b) (establishing the PRRB and articulating the requirements for bringing a group appeal). The PRRB's appeal process is designed to be adversarial: an aggrieved provider is opposed by Medicare Administrative Contractors ("MACs"), private health insurers which are contracted by CMS to process and remit payments to providers within a defined geographic region. *See* Pls.' Mot. for Summ. J. 2, 13 (describing the role of MACs); Def.'s Mot. for Summ. J. 3, 9 (same).

The PRRB lacks the power to adjudicate direct challenges to existing CMS regulations, such as IPPS rules.  *See Bayshore Cmty. Hosp. v. Azar*, 325 F. Supp. 3d 18, 21 (D.D.C. 2018) (citing 42 C.F.R. § 405.1867).  Thus, the plaintiffs argued that the PRRB had no authority to decide the legal question underlying their appeal and was therefore required to certify the appeal for "expedited judicial review" (EJR) in federal district court.  Pls.' Mot. for Summ. J. 13; *see* 42 U.S.C. § 1395oo(f)(1) (describing the process for obtaining judicial review in a Medicare payment dispute).  The plaintiffs requested certification in August 2020, but the PRRB declined, instead asking the plaintiffs for supplemental briefing on whether the Board had subject matter jurisdiction over the appeal in the first place.  Pls.' Mot. for Summ. J. 14.  Finally, in April 2023, the PRRB dismissed the appeal for lack of subject matter jurisdiction, on the grounds that the standardized amounts at issue in the appeal are "inextricably intertwined" with the Secretary's budget neutrality adjustments, which are in turn exempt from administrative and judicial review under the Preclusion Provisions.  *Id.* at 15.

After the Board dismissed their appeal, the hospitals timely filed the present challenge in this Court, as authorized by 42 U.S.C. § 1395oo(f)(1).  The plaintiffs argue that the Preclusion Provisions do not apply, either directly or indirectly, to the Secretary's inaugural standardized amounts calculation.  Pls.' Mot. for Summ. J. 16–40.  Alternatively, the plaintiffs argue that even if the Preclusion Provisions implicitly bar review of the standardized amounts calculation, the Court nevertheless has jurisdiction to review that calculation under the *ultra vires* doctrine.  *Id.* at 41–43.  They ask the Court to either review their challenge to the Secretary's inaugural standardized amount calculations immediately or, in the alternative, to remand the dispute so that the Board may act upon their EJR request.  Pls.' Mot. for Summ. J. 43–44.  In the event of a remand, the plaintiffs request that the Court retain jurisdiction and impose certain deadlines on to

ensure that their remanded appeals are processed quickly. *Id.* at 44. The Secretary has filed a cross-motion for summary judgment in support of the Board's jurisdictional determination, opposing the plaintiffs' *ultra vires* claim, and arguing against the Court retaining jurisdiction in the event of remand. *See* Def.'s Mot. for Summ. J., ECF No. 24. Both parties have also filed responses and replies. *See* Pls.' Reply, ECF No. 27; Def.'s Reply, ECF No. 33. The matter is therefore now ripe for this Court's review.

## III.    Legal Standard

### A.  Rule 56(a) Motion for Summary Judgment

To succeed on a motion for summary judgment, a movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Accordingly, when a case turns largely or entirely on matters of law—such as the interpretation of a statute or regulation—summary judgment is usually an appropriate procedural mechanism for resolving the dispute. *See 325-343 E. 56th St. Corp. v. Mobil Oil Corp.*, 906 F. Supp. 669, 674 (D.D.C. 1995) ("When the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate . . . includ[ing] matters turning on statutory interpretation.") (citing *Edwards v. Aguillard*, 482 U.S. 578, 594–97 (1987)). However, to the extent that any material facts are genuinely in dispute, a court considering a motion for summary judgment must construe the evidence in the light most favorable to the party opposing the motion, draw all reasonable inferences in their favor, and avoid weighing the evidence or making credibility determinations. *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine dispute" is one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

**B. Preclusion of Judicial Review**

The Administrative Procedure Act (APA) affords a "basic presumption" that judicial review be available "to one . . . 'adversely affected or aggrieved by agency action within the meaning of the relevant statute . . . .'" *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967) (citing 5 U.S.C. § 702). But this presumption is rebuttable. A court may determine that Congress has barred review of a particular dispute either explicitly or implicitly, "through express statutory language or the structure of the statutory scheme." *Mass. Coal. for Immigr. Reform v. U.S. Dep't of Homeland Sec.*, 621 F. Supp. 3d 84, 91 (D.D.C. 2022) (citing *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984)). For example, review is precluded if the challenged agency decision is "'indispensable' or 'integral' to, or 'inextricably intertwined' with, [an] unreviewable agency action." *Fla. Health Scis. Ctr., Inc. v. Sec'y of Health and Hum. Servs.*, 830 F.3d 515, 519 (D.C. Cir. 2016) (quoting *Tex. All. for Home Care Servs. v. Sebelius*, 681 F.3d 402, 409–11 (D.C. Cir. 2012)). However, overcoming the "'strong presumption'" in favor of reviewability "is no easy task; indeed, 'where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 887 (D.C. Cir. 2014) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986)). A plaintiff seeking review need only show that the pertinent statute is "reasonably susceptible" to an interpretation which permits it, whereas an agency attempting to evade review must show that its understanding of the preclusion provision is not just "plausible," but "compel[led] . . . ." *See Am. Clinical Lab'y Ass'n v. Azar*, 931 F.3d 1195, 1205, 1208 (D.C. Cir. 2019) (quoting *De Martinez v. Lamagno*, 515 U.S. 417, 434 (1995)). The presumption in favor of review also functions as an interpretive canon: where a statutory provision appears to preclude review of

some agency action, "the presumption applies to dictate that such a provision be read narrowly." *Id.* at 1204. A court must not assume, and should hesitate to find, that a preclusion provision encompasses other agency actions besides those obviously within its metes and bounds.

## IV.    The Plaintiffs Have Standing to Challenge the Secretary's Discharge Calculation

Before reaching the question of whether the statute precludes judicial review, the Court will first assure itself that the Constitution does not do so. The defendant argues that the plaintiffs lack standing to pursue their challenge in federal court because they have not made a "factual showing that the alleged 1983 error" in the calculation of the standardized amount "somehow adversely affected the [fiscal year] 2019 standardized amount 35 years later . . . ." Def.'s Mot. for Summ. J. 42. As detailed above, Congress intended for the inaugural standardized amount calculations to carry forward into later years, so the plaintiffs have clearly put forth a mechanical explanation for how the Secretary's alleged 1983 error would result in a depressed standardized amount in 2019. But, argues the Secretary, it may be that the Secretary's alleged error has been offset elsewhere, either by overstated costs in the data underlying the Secretary's 1983 calculation or by corrections made in the years since 1985. *Id.* The plaintiffs' response is to accuse the Secretary of trying to import factual considerations into the Court's jurisdictional analysis that are more properly suited to the damages phase of litigation.

The plaintiffs are mistaken in their efforts to recast the defendant's standing argument as a damages question unsuited to "this early jurisdictional stage." Pls.' Reply 31. This case is before the Court on cross-motions for summary judgment. As the Supreme Court instructed in *Lujan v. Defenders of Wildlife*, "the party invoking federal jurisdiction bears the burden of establishing" the three constitutional minima of Article III standing. 504 U.S. 555, 561 (1992). Specifically, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant;

and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan*, 504 U.S. at 560–61). Moreover, the party must establish these minima "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Thus, at the summary judgment stage, "the plaintiff can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts' which for purposes of the summary judgment motion will be taken to be true." *Id.* at 561 (quoting Fed. R. Civ. P. 56(e)). While the plaintiffs are not required at this stage to show evidence quantifying the damage they allegedly suffered, they *are* required to marshal evidence containing specific facts that, if accepted as true for purposes of the Motion, suggest that the plaintiffs suffered some non-zero quantum of harm.

Nevertheless, the plaintiffs have met this burden. The plaintiffs do not merely allege that the Secretary committed some nondescript error of unknown valence. Their claim that the Secretary lumped discharges and transfers together is uncontroverted. 49 Fed. Reg. 234, 245–46 (Jan. 3, 1984). Straightforward arithmetic dictates that this decision would be expected to yield a reduction in the inaugural standardized amounts. They also describe the mechanism by which this initial decision would affect future payments, an explanation which the D.C. Circuit has endorsed. *See Cape Cod*, 630 F.3d at 205 ("CMS does not calculate the standardized amount from scratch each year. Instead, following Congress's directive, it calculated the standardized amount for a base year and has since carried that figure forward, updating it annually for inflation."); *Saint Francis*, 894 F.3d at 291 ("To this day . . . Medicare payments for inpatient services depend in part on factual determinations . . . embedded in 1983 calculations, including the calculation of 'allowable operating costs per discharge.'"). Finally, the plaintiffs' Schedules of Providers demonstrates an effort to calculate each hospital's amount in controversy based on

the Secretary's alleged error, as does the plaintiffs' EJR request. *See, e.g.*, Joint Appendix 5175–81, 1083–85, ECF No. 36.  Having advanced a cogent theory of injury supported with evidence adequate for this stage of litigation, the plaintiffs have met Article III's demands.

Next, the Secretary argues that the inaugural standardized amount calculations were, in fact, inflated rather than deflated, "because they were based on unaudited cost report data and included elements of capital costs."  Def.'s Mot. for Summ. J. 42.  Whether or not this is true, it is irrelevant to this dispute.  Even if the Secretary committed some unrelated error when calculating the 1984 standardized amounts which happened to inure to the plaintiffs' benefit, that accident has no bearing on the independent, judicially cognizable injury which the plaintiffs now allege—to wit, that the Secretary's supposedly unlawful categorization of transfers as discharges exerted downward pressure on their compensation.  Had the Secretary used appropriately audited data, the effect of his alleged miscategorization of transfers as discharges would be the same: a reduction in the standardized amounts from what they *would otherwise have been* but for that error.  In other words, a defendant cannot erase a plaintiff's injury simply by gesturing to some unrelated benefit of equal or greater value that they have previously conferred upon that plaintiff.  And in any event, it is not for the Court, on cross-motions for summary judgment directed at a jurisdictional question, to size up the relative gravity of these supposed errors.  That exercise is more properly a matter for the damages phase of litigation, if such a phase should be reached.

The Secretary also argues that a handful of adjustments to the standardized amounts that took place between 1985 and 1997 may have broken the chain between the inaugural calculations and the allegedly depressed 2019 standardized amounts.  Def.'s Mot. for Summ. J. 42 & n.17.  It is, to be sure, conceivable that some such intervening event(s) severed the continuity between the 1984 and 2019 standardized amounts, although the D.C. Circuit, writing

as recently as 2018, did not seem bothered by that possibility. *See Saint Francis*, 894 F.3d at 291 (stating that present-day Medicare payments for inpatient services remain linked to the inaugural cost-per-discharge calculation); *see also Cape Cod*, 630 F.3d at 205 (noting in 2011 that CMS has carried forward its original standardized amount calculations ever since their original computation). But in the 2019 IPPS Final Rule, the Secretary himself reiterated that the current standardized amount is the result of adjusting and updating the original standardized amounts, necessarily—if implicitly—disclaiming the possibility that subsequent statutory or regulatory changes have washed away any trace of the inaugural calculations. *See* Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals, 83 Fed. Reg. 41144, 41713 (Aug. 17, 2018) (noting that the "national standardized amount is based on per discharge averages of adjusted hospital costs from a base period . . . updated and otherwise adjusted in accordance with" the statute). Moreover, the defendant makes no effort in his briefs to specifically identify *which* intervening adjustments sever the linkage between the initial standardized amounts and the 2019 ones, instead gesturing vaguely to a possible list of such adjustments compiled by the Board. *See* Joint Appendix 494–500. This is not enough to rebut the plaintiffs' theory of injury. Just as a defendant cannot defeat standing by "[m]erely identifying potential alternative causes" for the plaintiff's injury, *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 969 (7th Cir. 2016), neither can the Secretary do so by speculating about events that may or may not have nullified the injury itself. Some effort exploring the argument is required, and is missing here.

The defendant raises one final standing argument: When the Secretary calculated the standardized amounts for 1986, he based his calculation on the prior year's average standardized amounts *after adjustment for budget neutrality*, rather than on the unadjusted 1985 average standardized amounts. *See* Def.'s Reply 19–20 & n.8–9. Thus, the argument goes, even if the

Secretary miscalculated the inaugural standardized amounts, it does not matter: they would have been adjusted up or down to *the same fixed point* as required to achieve budget neutrality in 1985, then carried forward into 1986 and beyond, thus "negat[ing] any continued effect of the alleged error." Def.'s Reply 20 n.8. The plaintiffs concede that the Secretary carried forward the budget-neutralized amounts from 1985 to 1986, but argue that this too was an error because the statute specifically required the Secretary to use the *unadjusted* 1985 average standardized amounts as the starting point for 1986. *See* Pls.' Reply 15–16 & n.8–9. The Secretary disagrees that this decision was erroneous. Moreover, erroneous or not, the Secretary argues that the plaintiffs cannot challenge the Secretary's decision in 1986 to carry forward the prior year's budget-neutralized standardized amounts for two reasons: because they failed to raise the argument before the PRRB, and therefore waived it, and alternatively because such a challenge would be barred by the Preclusion Provisions. None of the Secretary's arguments is persuasive.

First, the plaintiffs did not waive the argument that the Secretary unlawfully incorporated the prior year's budget neutrality adjustment into the 1986 standardized amounts by failing to raise it before the PRRB. There is no dispute that the hospitals complied with the Board's procedural requirements for bringing an appeal, so the dispute here concerns not exhaustion of administrative remedies, but rather issue exhaustion: were the plaintiffs required to argue this specific point before the PRRB before litigating it in federal court? "[E]ven without a statutory or regulatory requirement, 'courts require administrative issue exhaustion as a general rule' when the administrative review process involves adversarial proceedings." *New LifeCare Hosps. of N.C. LLC v. Azar*, 466 F. Supp. 3d 124, 131 (D.D.C. 2020) (quoting *Sims v. Apfel*, 530 U.S. 103, 109 (2000)). At least one court in this District has held that the PRRB process is adversarial within the meaning of *Sims*, insofar as providers arguing before the Board are represented by

"knowledgeable and specialized attorney[s]," "face[] an adversarial process where the [Medicare Administrative] Contractor's attorneys oppose[] them in the role of a 'prosecution,'" and the PRRB hearing process incorporates certain trial-like features such as the presentation of evidence, cross-examination, and ruling on legal objections. *Id.* at 132.

Whether or not that is true in the usual case, however, the plaintiffs here did not have the opportunity for adversarial argument with respect to the specific jurisdictional argument on which the Secretary now relies. As the plaintiffs argue in their Reply, the PRRB dismissed their appeal on jurisdictional grounds "without there even being an actual pending jurisdictional objection" by the MACs, their counterparty before the Board. Pls.' Reply 16 n.9. This is confirmed by the administrative record, which contains multiple submissions by Federal Specialized Services, the MACs' legal representatives before the PRRB. These submissions raise just one significant jurisdictional argument: that review of the inaugural standardized amounts is prohibited because it would implicate the unreviewable budget neutrality adjustments (an argument which the Court addresses below). *See* Joint Appendix 981–86, 1950–54. But, critically, the MACs never suggested that the Secretary's erroneous decision to carry forward the 1985 budget neutrality adjustment into the 1986 standardized amounts vitiated the plaintiffs' injury and thus deprived the Board of subject matter jurisdiction due to a lack of standing.

It appears that the Board itself raised this issue for the first time in its October 2021 Notice of Denial of EJR & Request for Information. *Id.* at 962. But even then, it was framed merely as an "example[]" to "illustrate the Board's concern" that the plaintiffs had "grossly oversimplified" the reverberating effects of the inaugural standardized amounts calculation, not as a barrier to standing. *Id.* at 961. Moreover, the Board raised it in the context of a far broader request for the plaintiffs to "confirm for each intervening year [since 1984] whether there are any

factors or adjustments or changes that would eliminate . . . the Providers' concerns regarding the effect of the 1981 cost data." *Id.* The plaintiffs reasonably could have—and in fact did— understand this query as relating to the merits of the dispute and the quantification of damages, rather than the Board's jurisdiction. *Id.* at 905–06. And evidently, the MACs' response to the Board's Notice did not adopt this jurisdictional argument; to the contrary, it concedes that they could not "definitively confirm the presence or absence of factors or adjustments for each subsequent cost year" that might nullify the plaintiffs' supposed injury. *Id.* at 848.

To recap: The argument that the plaintiffs suffered no injury because the Secretary carried over the 1985 budget neutrality adjustments into the 1986 standardized amounts was never presented by the plaintiffs' adversaries in the PRRB proceedings. It was only raised by the Board itself, in the role of arbiter, and was only definitively presented as a jurisdictional issue for the first time when the Board issued its final ruling dismissing the plaintiffs' appeal. Moreover, the plaintiffs had no reason to raise this issue on their own initiative because their claims arise from the Secretary's alleged miscalculation of the standardized amounts in 1983, not from this supposed error in 1986. Indeed, the 1986 error only figures in this litigation at all because the Board and the Secretary have raised it as a jurisdictional defense, and litigants are not ordinarily "obligat[ed] to anticipate and respond to a defendant's potential defenses," only to counter them when they are raised. *Steinberg v. Republic of Sudan*, No. 20-cv-2996-RCL, 2023 WL 2682369, at *5 n.8 (D.D.C. Mar. 29, 2023). Once the Board reached its decision to dismiss, the plaintiffs sought discretionary review from the CMS Administrator pursuant to 42 U.S.C. § 1395oo(f)(1), which was rejected. Joint Appendix 1–3. At that point, their only recourse was to pursue judicial review and litigate the issue in court, which is exactly what they have done.

Issue exhaustion in the administrative context is "an analogy to the rule that appellate courts will not consider arguments not raised before trial courts." *Sims*, 530 U.S. at 108–09. And as numerous appellate courts have held, "[a]n argument is not waived when a [litigant's] first opportunity to challenge a district court proceeding is on appeal." *Corp. Synergies Grp., LLC v. Andrews*, 775 Fed. App'x 54, 59 (3d Cir. 2019); s*ee also Paris v. Dep't of Hous. & Urb. Dev.*, 713 F.2d 1341, 1347 (7th Cir. 1983) (holding that an objection on appeal was not waived where "[the] appeal is, in effect, the plaintiffs' first opportunity" to raise their objection); *Herbert v. Dickhaut*, 695 F.3d 105, 109 (1st Cir. 2012) ("There can be no waiver where a party lacked an opportunity to raise an argument."). With respect to the particular argument that the Secretary should not have incorporated the 1985 budget neutrality adjustments into the 1986 standardized amounts, the plaintiffs had no genuine opportunity "to develop the issue[] in an adversarial administrative proceeding" before they arrived in this Court. *Sims*, 530 U.S. at 110. To hold that the plaintiffs waived this argument by failing to present it to the PRRB would be to penalize them for not preemptively addressing a jurisdictional defense that their adversaries never presented and that is collateral to their own claims. This the Court will not do. Because the plaintiffs argued this issue on their first real occasion to do so, that argument is not waived.

Second, the Secretary's argument that the Preclusion Provisions forbid the Court from evaluating his decision to incorporate the prior year's budget-neutralized rates into the 1986 standardized amount calculation fares no better. As described above, the Preclusion Provisions bar review of "the requirement, or the proportional amount, of any adjustment *effected pursuant to subsection (e)(1)*," 42 U.S.C. § 1395ww(d)(7) (emphasis added), which refers to the budget neutrality adjustments. The plaintiffs are not challenging the "requirement" or "proportional amount" of the 1985 budget neutrality adjustment *itself*; rather, they are asserting that the outputs

of this adjustment should not have been used as the basis of the subsequent year's standardized amount calculation.  Pls.' Mot. for Summ. J. 27–28.  Under a plain textual reading of the statute, the Preclusion Provisions simply have no bearing on a challenge of that nature.

Nor could the Secretary argue that the decision to incorporate the prior year's budget neutrality adjustment into the 1986 standardized amounts is unreviewable as an "adjustment effected pursuant to" the budget neutrality provisions.  As the Court will explain momentarily, no part of the IPPS statute, including the budget neutrality provisions, authorized the Secretary to carry forward the 1985 budget neutrality adjustment to the following year; in fact, the statute forbade him from doing so.  Therefore, the Secretary's decision to base the 1986 standardized amounts on the prior year's budget-neutralized rates was not "effected pursuant" to the budget neutrality provisions or, indeed, pursuant to any statutory authority at all.  The Secretary may not flout Congress's chosen methodology, argue sophistically that he did so in the name of budget neutrality, and then claim the aegis of the Preclusion Provisions to shield his error from review.

Having decided that the plaintiffs' argument—that the Secretary erred by using the 1985 budget neutrality-adjusted standardized amounts as the starting point for his 1986 rate-setting calculations—is neither waived nor statutorily precluded, the Court now addresses the merits of that argument.  For fiscal years after 1984, the statute required the Secretary to "compute an average standardized amount" based on the "average standardized amount computed for the previous fiscal year under [42 § 1395ww(d)(2)(D)] or under this subparagraph, increased for fiscal year 1985 by the applicable percentage increase under subsection (b)(3)(B), and adjusted for subsequent fiscal years in accordance with the final determination of the Secretary under subsection (e)(4) . . . ."  Pub. L. No. 98-21, § 601, 97 Stat. 65, 156 (1983).  The question is whether this passage afforded the Secretary discretion to choose whether to use a prior year's

unadjusted or budget-neutralized average standardized amounts as the starting point for the following year's standardized amounts. It does not; the Secretary was required to use the former.

As detailed in the eight-step IPPS methodology above, the cross-reference to 42 U.S.C. § 1395ww(d)(2)(D) unambiguously refers to the *unadjusted* average standardized amounts calculated in the *fourth* step of the rate-setting methodology prescribed by Congress; adjustment for budget neutrality does not take place until the *sixth* step. And "subsection (b)(3)(B)" refers to "reduct[tion] for [the] value of outlier payments," not budget neutrality. Taken together, this section dictates that the Secretary had no authority to carry forward the 1984 budget-neutralized amounts to 1985; he was to base his 1985 calculations on the unadjusted 1984 average standardized amounts.

Similarly, for 1986, Congress directed the Secretary to start with the "respective average standardized amount computed for the previous fiscal year . . . *under this subparagraph* . . ." 97 Stat. at 156 (emphasis added). But the 1985 budget neutrality adjustments do not occur until two subparagraphs *after* "this subparagraph," namely in subsection (b)(3)(C). *Id.* Thus, this passage signals unambiguously that, in computing the 1986 standardized amounts, the Secretary was required to start with the 1985 average standardized amounts *unadjusted for budget neutrality*. The only discretion that the Secretary had in calculating the 1986 standardized amounts is that provided "under subsection (e)(4)," which authorizes the Secretary to determine, beginning in fiscal year 1986, the "applicable percentage increase . . . for discharges in that fiscal year . . . ." 97 Stat. at 159–60. But this grant of authority merely gives the Secretary discretion to determine *how much* the standardized amounts should be increased from one year to the next; it does not authorize to the Secretary to ignore Congress's express directive that the prior year's average standardized amounts, unadjusted for budget neutrality, must serve as the base amount to be

increased.  It should also be noted that the methodology for calculating the 1986 average standardized amounts omits any reference to subsection (b)(3)(C) which, again, is the statutory provision that authorizes the 1985 budget neutrality adjustments.

The statute simply supplies no basis for carrying forward the budget-neutralized standardized amounts from 1985 to 1986; to the contrary, it forbade the Secretary from doing so. As the plaintiffs argue in their Reply brief, by carrying forward the 1985 budget neutrality adjustment into the following year's standardized amounts, he patently violated this statutory requirement.[3]  Pls.' Reply 15–16 & n.9.  The Secretary cannot use his error of 1986 to launder the effects of his alleged error of 1983.

The plaintiffs' theory of injury, briefly restated, is as follows: First, the Secretary miscalculated the inaugural standardized amounts.  Second, because each year's standardized amounts are based in part on the prior year's standardized amounts, that original error will result in ongoing under-compensation until it is corrected.  Third, to the extent that the Secretary's 1986 calculation severed the linkage between the 1984 and 2019 standardized amounts, that

---

[3] If this clear textual command were not enough, Congress also left other textual indicators showing that "average standardized amount" refers to non-budget-neutralized amounts.  For example, step four of the inaugural IPPS methodology calls for the Secretary to reduce the "average standardized amounts *determined under [42 U.S.C. § 1395ww(d)(2)(D)]*" by a proportion necessary to account for outlier payments.  42 U.S.C. § 1395ww(d)(2)(E) (emphasis added).  This implicitly recognizes that the non-budget-neutralized product of step four is, definitionally, the "average standardized amount."  The Secretary himself appeared to recognize as much: in the interim rule describing the process for calculating the 1984 IPPS amounts, the Secretary drew a distinction between the "average standardized amounts" determined at step four, *see* 48 Fed. Reg. 39752, 39766 (Sept. 1, 1983), and the "adjusted standardized amounts" which are the products of the outlier and budget neutrality adjustments that take place in steps five and six.  *Id.* at 39767.

In the 1986 IPPS rule, the Secretary took a different position: "We do not agree that the prior years' standardized rates before budget neutrality should serve as the basis for updating the FY 1986 rates.  Since the budget-neutralized standardized amounts represent the actual payment rates used to pay hospitals in FY 1985, we believe the 'percentage change' for FY 1986 should be applied to these amounts.  In addition, section [1395ww(d)(3)(A)] . . . does not explicitly require that the update factor apply to the FY 1985 payment rates prior to the adjustments for budget neutrality in FY 1985."  As explained above, the Secretary's reading was mistaken: § 1395ww(d)(3)(A) *does* "explicitly require" that the 1986 standardized amounts be based on the pre-budget neutrality standardized amounts from the prior year.  And although the Secretary may have had good policy reasons for wanting to use the prior year's "actual [i.e., budget-neutral] payment rates" as the basis for the 1986 standardized amounts, that decision was not his to make because it was statutorily proscribed.

calculation was also erroneous, and but for these two errors, the plaintiffs would have received more money for services rendered to Medicare patients in 2019. That theory satisfies each aspect of Article III's case or controversy requirement. Since the plaintiffs have demonstrated standing, the Court now turns to the main substance of the dispute: whether the Preclusion Provisions bar, either expressly or impliedly, the plaintiffs' challenge to the Secretary's inaugural standardized amount calculation in 1983. The Court concludes that they do not.

## V. The Preclusion Provisions Do Not Preclude Review of the 1984 Standardized Amounts

Due to the "strong presumption" in favor of judicial review of agency action, *El Paso*, 750 F.3d at 887, the defendant must demonstrate convincingly—not just plausibly—that Congress intended for the Preclusion Provisions to bar administrative or judicial review of the Secretary's standardized amounts calculation for fiscal year 1984. The Secretary can meet that burden either by showing that the statute explicitly forbids review of that calculation, or that it does so impliedly because that calculation is "inextricably intertwined" with a different unreviewable agency action. *Fla. Health*, 830 F.3d at 519. The defendant cannot prevail under either theory.

### A. The Preclusion Provisions Do Not Expressly Preclude Review

A plain textual reading of the Preclusion Provisions does not evince congressional intent to immunize the Secretary's cost-per-discharge calculation from judicial or administrative review. As discussed above, 42 U.S.C. § 1395ww(d)(7)(A) precludes review only of one agency decision that is relevant to this litigation[4]: "adjustment[s] effected pursuant to subsection (e)(1) . . . ." Subsection (e)(1), in turn and in pertinent part, refers to the budget neutrality provisions.

---

[4] § 1395ww(d)(7)(A) also precludes review of certain other agency decisions, such as the establishment of DRGs, the "classification of discharges within such [DRGs]," and the calculation of DRG weights. But none of the other agency decisions listed in this subsection are implicated in this litigation.

This is clear from its cross-reference to "subsection (d)(2)(F)," the budget neutrality adjustment which takes place in step 6 of the inaugural IPPS methodology. The PRRB statute reiterates the unreviewability of the "determinations and other decisions described in section 1395ww(d)(7)," to wit, the 1984 and 1985 budget neutrality adjustments. *See* 42 U.S.C. § 1395oo(g)(2). And CMS's own regulation, mirroring the language of 42 U.S.C. § 1395ww(d)(7), bars review of "the determination of the requirement, or the proportional amount, of the budget neutrality adjustment[s] . . . ." 42 C.F.R. § 405.1804(a). None of the Preclusion Provisions affords any textual support whatsoever for the proposition that Congress meant to preclude review of the Secretary's inaugural standardized amount calculation. Such a reading is not even plausible, let alone compelling enough to surmount the presumption of reviewability.

The defendant nevertheless urges the Court to adopt a more expansive reading of the Preclusion Provisions. In the Secretary's view, budget neutrality is not "merely a discrete 'step' in a process for computing FFY 1984/1985 amounts, [but] rather an overarching requirement applicable to the entirety of the IPPS payment systems for FFYs 1984 and 1985." Def.'s Mot. for Summ. J. 33 n.10. "Congress could not be expected to anticipate and specify in advance every type of challenge that might entail improper review of [the budget neutrality adjustments]," so it instead specified only the budget neutrality provision for preclusion, intending that this would also preclude review of "related computations that might affect the [budget neutrality] adjustment." *Id.* at 34.

This suggested interpretation of the statute is unpersuasive. First, the argument that the budget neutrality adjustments are not "discrete steps" in a multi-step process clashes irreconcilably with the statute's text. As described above, § 1395ww(d)(2) sets forth a detailed eight-step roadmap for calculating the inaugural 1984 IPPS rates, with most phases in that

roadmap containing an explicit cross-reference to the one preceding them.  It is hard to imagine a statute with a more stepwise structure.[5]  Moreover, other parts of the statute contain explicit cross-references to specific steps in this process, some of which are facially irrelevant to budget neutrality.[6]  These references to discrete steps in the roadmap show that Congress attributed a distinct function to each phase of the process.  It is convenient for the Secretary to imagine that Congress designed the whole process with the primary "overarching" goal of budget neutrality in mind, but that is not what the text and structure of the statute suggest.

Second, though it may indeed have been impossible for Congress to anticipate and enumerate every possible challenge that might implicate the budget neutrality provisions, it does not follow that the narrow Preclusion Provisions that Congress ultimately enacted should be read more expansively than their text will bear.  For example, Congress could have easily immunized *every step* of the inaugural IPPS calculation outlined in § 1395ww(d)(2) from administrative or judicial review.  Or it could have immunized every step in the roadmap that *preceded* the budget neutrality adjustment, since an alteration to one of these upstream steps would call for an offsetting change to the budget neutrality factor.  But it did not.

For comparison, when the same Congress overhauled the process for compensating skilled nursing facilities just fifteen months later, it used substantially broader language to bar review of the *entire* multi-step process that it prescribed for calculating federal per diem rates. *See* 42 U.S.C. § 1395yy(e)(8)(A) (barring "administrative or judicial review" of "the

---

[5] *See, e.g.*, 42 U.S.C. § 1395ww(d)(2)(B) ("The Secretary shall update each amount determined under subparagraph (A) . . . ."); *id.* § 1395ww(d)(2)(C) ("The Secretary shall standardize the amount updated under subparagraph (B) . . . ."); *id.* § 1395ww(d)(2)(D) ("The Secretary shall compute an average of the standardized amounts determined under subparagraph (C) . . . ."); *id.* § 1395ww(d)(2)(E) ("The Secretary shall reduce each of the average standardized amounts determined under subparagraph (D) . . . .").

[6] *See, e.g.*, 42 U.S.C. § 1395ww(d)(3)(A) (requiring the Secretary to calculate the new standardized amounts by updating the "respective average standardized amount computed for the previous fiscal year under paragraph [42 U.S.C. § 1395ww(d)](2)(D)").

establishment of Federal per diem rates under paragraph (4)," a multi-step process involving computation of standardized per diem rates and adjusting them for case mix, geographic wage differentials, etc.). But Congress chose not to do so for IPPS, and the Court is bound to give that decision effect. The Court will not presume that Congress meant something other than what it wrote, and even if it did, the Court would not assume the authority to fix Congress's mistake.[7, 8]

## B. The Calculation of the 1984 Standardized Amounts Is Not "Inextricably Intertwined" with the Budget Neutrality Adjustments

The Secretary argues that, even if the Preclusion Provisions do not directly preclude review of the inaugural standardized amounts calculation, review is unavailable because that calculation is "inextricably intertwined" with the unreviewable budget neutrality adjustments, and is therefore unreviewable itself. *Fla. Health*, 830 F.3d at 519. The argument goes as

---

[7] The defendant also argues that Congress may have purposefully shirked from attempting to enumerate a full list of unreviewable agency actions because "trying to list prohibited challenges in advance would have created the misimpression that preclusion is narrower than it was intended to be. Challenges inadvertently omitted from the list would, by implication, be erroneously seen as reviewable . . . ." Def.'s Mot. for Summ. J. 12. If anything, this argument cuts against the Secretary's position because Congress did, in fact, enumerate some specific agency actions review of which is precluded. Apart from the budget neutrality adjustments, Congress also immunized "the establishment of diagnosis-related groups, . . . the methodology for the classification of discharges within such groups, and . . . the appropriate weighting factors thereof . . . ." 42 U.S.C. § 1395ww(d)(7)(B). If Congress lists a handful of agency actions that are not reviewable, and the agency action at issue is not on that list, the most natural conclusion is that Congress did not intend to shield it from review. *See Qi-Zhuo v. Meissner*, 70 F.3d 136, 139 (D.C. Cir. 1995) ("[A]n item which is omitted from a list of exclusions is presumed not to be excluded.").

[8] "[W]e do not resort to legislative history to cloud a statutory text that is clear," as in the case at hand. *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 212 (D.C. Cir. 2013) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994). Nonetheless, the Court notes in passing that the House Committee Report accompanying the IPPS statute strongly favors of the plaintiffs' narrow interpretation of the Preclusion Provisions. It states that the proposed law would "permit review except in the narrow cases necessary to maintain budget neutrality and avoid adversely affecting the establishment of the diagnosis related groups, the methodology for the classification of discharges within such groups, and the appropriate weighting of such groups." H.R. Rep. No. 98-25, at 143 (1983), *as reprinted in* 1983 U.S.C.C.A.N. 219, 362. Precluding review of the inaugural standardized amount calculation would not be "necessary to maintain budget neutrality," because any successful challenge to the standardized amount could be offset by a commensurate change to the budget neutrality adjustment. More to the point, in a predicate facts challenge such as this, review of the inaugural standardized amount calculation has no effect on budget neutrality *at all*, because Congress only mandated budget neutrality for 1984 and 1985, and the plaintiffs seek damages only for 2019. Congress's intention seemed to be to avert challenges to the Secretary's execution of the budget neutrality adjustments that would frustrate efforts to achieve actual budget neutrality in the early years of the IPPS system. The plaintiffs' challenge would not run counter to that intent.

follows: any change to the standardized amounts would have required the budget neutrality adjustments to dial up or down commensurably to ultimately achieve budget neutrality. In other words, a challenge which concludes that the standardized amounts were wrong necessarily implies that the budget neutrality adjustments were, in an objective sense, wrong as well. But, as already discussed, the Preclusion Provisions forbid the Court from passing judgment on the propriety of the budget neutrality adjustments. *See, e.g.*, 42 U.S.C. § 1395ww(d)(7)(A). Therefore, because the budget neutrality adjustment is exempt from judicial or administrative review, the standardized amounts must perforce be exempt as well. As the Court will now explain, this argument takes the concept of "inextricably intertwined" agency action further than the underlying doctrine will permit. The inaugural standardized amounts and the inaugural budget neutrality adjustments are not "inextricably intertwined," as that phrase is deployed in this Circuit's precedent. Therefore, judicial review is not precluded.

The "inextricably intertwined" motif on which the Board and the Secretary both rely originates with *Texas Alliance for Home Care Services v. Sebelius*, 811 F. Supp. 2d 76, 87 (D.D.C. 2011) (Lamberth, C.J.), *aff'd*, 681 F.3d 402 (D.C. Cir. 2012). The plaintiffs in that case—a trade association representing medical equipment suppliers who bid for Medicare contracts, a one such supplier—challenged the Secretary's practice of evaluating bidders' financial eligibility for such a contract without first promulgating a regulation enumerating the standards by which bidders were assessed. *Id.* at 84–85; *Tex. All.*, 681 F.3d at 408. The statute at issue contained a provision which barred judicial or administrative review of "the awarding of contracts," 42 U.S.C. § 1395w-3(b)(11)(B), as well as "the bidding structure and number of contractors selected . . . ." *id.* § 1395w-3(b)(11)(F). The District Court held that both provisions independently suffice to "preclude challenges to the Secretary's articulation of financial

standards . . . ." *Tex. All.*, 811 F. Supp. 2d at 90.  Specifically, the "awarding of contracts" provision barred review because the delegation of authority to set financial standards "[was] found in the section entitled 'conditions for awarding contracts . . . .'" *Id.* at 89.  In other words, "there [was] simply 'no reason to distinguish' among standards of eligibility, on the one hand, and the awarding of a contract, on the other," the former being "'part of the overall award scheme'" for the latter. *Id.* at 88–89 (quoting *All Fla. Network Corp. v. United States*, 82 Fed. Cl. 468, 473 (Fed. Cl. 2008), and *Atl. Urological Assocs., P.A. v. Leavitt*, 549 F. Supp. 2d 20, 30 (D.D.C. 2008)).  Similarly, the "bidding structure" provision barred review of the Secretary's articulation of financial standards because, where "the preclusion provision shields a particular agency decision from review—in this instance the structure for the bidding process—it also shields the subcomponents of that process, which includes the financial standards." *Id.* at 89.

The Court of Appeals affirmed, holding that both provisions precluded a challenge based on articulation of financial standards. *Tex. All.*, 681 F.3d at 409–11.  Agreeing with this Court's analysis of the "awarding of contracts" provision, the D.C. Circuit held that the development of financial standards was "'tie[d] . . . to the Secretary's decision to grant or deny a contract' because the financial standards requirement '[was] found in the section entitled "Conditions for awarding contracts . . . ."'" *Id.* at 409 (quotations omitted).  The Circuit also agreed with the District Court's interpretation of the "bidding structure" provision, holding that "the financial standards . . . are integral to" or "inextricably intertwined" with the unreviewable "bidding structure the Secretary has erected." *Id.* at 411.  For both the District Court and the Court of Appeals, it was clear that if a challenged agency action is either textually or functionally "subsumed within" or otherwise "integral to" an unreviewable agency action, the challenge may not proceed.  Neither opinion, however, was content to hold that just any relationship between

the challenged and unreviewable actions is enough to unfurl the umbrella of unreviewability; something more is required.  Several opinions since *Texas Alliance* have applied and expounded upon the "inextricably intertwined" concept, offering guidance as to what that "something" is.

In *Florida Health*, the D.C. Circuit held that a statutory provision which barred review of the Secretary's estimate of the "amount of uncompensated care" delivered by a hospital also precluded a challenge alleging that the Secretary unlawfully formulated that estimate based on obsolete data.  *Fla. Health*, 830 F.3d at 518.  The D.C. Circuit reasoned that the underlying data came within the bounds of the preclusion provision because "the data are the entire basis for the estimate" and, as such, permitting "a challenge to the data would 'eviscerate the bar on judicial review'" of the estimate itself.  *Id.* at 519 (quoting *El Paso Nat. Gas Co. v. United States*, 632 F.3d 1272, 1278 (D.C. Cir. 2011)).  The *Florida Health* court, in other words, seized on the "close connection between the element being challenged and the decision that could not be challenged in court," which in that case were essentially two sides of the same coin.  *Id.* at 521.

In *Mercy Hospital, Inc. v. Azar*, the plaintiff hospital challenged CMS's implementation of its amended "low-income percentage" ("LIP") formula, which was one factor that the agency used to calculate prospective payment rates for inpatient rehabilitation hospitals.  891 F.3d 1062, 1064–65 (D.C. Cir. 2018).  The D.C. Circuit held that the plaintiff's challenge to the LIP formula was inextricably intertwined with, and therefore precluded by, a statutory provision barring review of the "establishment of . . . the prospective payment rates."  *Id.* at 1067.  It reached this conclusion for two reasons: First, textually, the "language of the statute tie[d] together" these two elements through internal cross-references.  *Id.*  Second, as a practical matter, "a hospital that asks for review of the LIP adjustment used to calculate its reimbursement would be asking the court to remand the [prospective payment rates] to be recalculated with a different LIP formula,"

which would require the court to make the forbidden determination that the prospective payment rates were improperly calculated. *Id.* The court continued: "Because reviewing a formula used by the prospective payment rate would effectively review the rate itself, we cannot review the former if we cannot review the latter." *Id.*

In *DCH Regional Medical Center v. Azar*, 925 F.3d 503 (D.C. Cir. 2019), the Court of Appeals again considered the same statute at issue in *Florida Health*. This time, the plaintiff challenged CMS's methodology for calculating it's "share of all nationwide uncompensated care" after it merged with another hospital. *Id.* at 505. That share is one of three statutory "factors" that determine a hospital's annual "disproportionate share hospital" payment (or "DSH payment"), which is extra compensation paid each year to hospitals that serve a disproportionate number of low-income patients. *Id.* at 503–04. The statute expressly precludes review of the Secretary's estimate of each "factor," so the plaintiffs framed their suit as a challenge to the Secretary's *methodology* for calculating the factor, rather than a challenge to the unreviewable estimate itself. *Id.* at 505. The D.C. Circuit rejected this distinction because "a challenge to the methodology for estimating uncompensated care is unavoidably a challenge to the estimates themselves. The statute draws no distinction between the two." *Id.* at 506. Noting that the plaintiff's desired remedy was vacatur of the Secretary's (unreviewable) estimate, the court emphasized that there was "no way to review the Secretary's method of estimation without reviewing the estimate itself"; challenging the former was "unavoidably a challenge" to the latter. *Id.* Finally, the D.C. Circuit found it significant that the plaintiff's "proposed distinction between methodology and estimates would eviscerate the statutory bar, for almost any challenge to an estimate could be recast as a challenge to its underlying methodology." *Id.*

The most recent D.C. Circuit case to significantly expound upon the "inextricably intertwined" concept, which is also the most analogous to the case at hand, is *American Clinical Laboratory Association v. Azar*, 931 F.3d at 1195.  In that case, the plaintiffs challenged the Secretary's decision to effectively exclude data from hospitals' internal laboratories in his calculation of a "weighted median" cost for laboratory tests, which would be used to set Medicare reimbursement rates for such tests.  Because hospital laboratories charged prices higher than other labs, excluding their data from the weighted median calculation depressed Medicare's reimbursement rates for lab tests.  *Id.* at 1199–1202.  The court recognized that "the results of the data collection process are used to establish" the ultimate payment amounts, which were statutorily immunized from judicial or administrative review.   *Id.* at 1204, 1207.  Nevertheless, the court held that it had jurisdiction to review "the rule delineating the data collection practices that precede and inform the setting of those amounts" because "the statute's bifurcated structure" suggests that the data collection provision and rate-estimation provision "are distinct" and "not 'inextricably intertwined . . . .'"  *Id.* at 1205–07.  The court identified various statutory features that distinguished *American Clinical Laboratory Association* from *Texas Alliance, Florida Health, Mercy Hospital* and *DCH*.  First, the statute's language on data collection, which refers to "reporting private sector data *for* the establishment of payment amounts," suggests that the data reporting is a "separate statutory duty preceding the establishment of" the payment rates.  *Id.* at 1205 (emphasis in original).  Put otherwise: "Unlike the provisions at issue in *Texas Alliance* and *Mercy Hospital*, the statutory text here does not subsume the data collection process within the establishment of payment amounts."  *Id.* at 1206.  Second, the court noted the lack of "internal cross-references" tying these two statutory duties together, unlike the disputed provisions in *Mercy Hospital*.  *Id.*  Third, the court distinguished

*Florida Health* and *DCH* by noting that the lab test statute required CMS to set the data collection parameters through a separate notice-and-comment rulemaking process, and that the data collection process imposed "new obligations on private parties . . . ." *Id.*

A few recurring principles emerge from this review of precedent. First, one agency decision is inextricably intertwined with another if the former is entirely subsumed within or practically indistinguishable from the latter, i.e. because the former constitutes the entire factual or methodological basis for the latter. Second, textual clues, such as whether the two agency processes appear in the same or different subsections of the controlling statute and the presence or absence of internal cross-references, may suggest whether the processes are inextricably intertwined. Third, agency actions are not inextricably intertwined if the means of implementing them are very different in practice, such as if they entail distinct rulemaking processes, impose different obligations on private parties, or occur at different times. Fourth, lest a plaintiff circumvent Congress's intent to preclude review through artful pleading, agency decisions are inextricably intertwined if a challenge to one necessarily constitutes a challenge to the other. But it is not enough that a successful challenge to one agency action implies, even with near certainty, that the other was done improperly; rather, the plaintiff must be seeking some remedy that implicates the unreviewable agency action. *Compare Am. Clinical Lab'y Ass'n*, 931 F.3d at 1207 (permitting a challenge to the agency's data collection process rule, despite acknowledging that the results of this process were "used to establish" an unreviewable payment rate), *with DCH*, 925 F.3d at 506 (forbidding review where the plaintiff sought vacatur of an unreviewable agency estimate by attacking the methodology underlying that estimate), *and Mercy Hospital*, 891 F.3d at 1067 (rejecting a challenge that would require remand and recalculation of an unreviewable payment rate). This requirement is consonant with the presumption of

reviewability: if a statutory provision barring judicial review of one agency action also immunized *every other* agency decision which affected the unreviewable one, the presumption of review would be badly eroded.  If, after applying these indicia, the statute is still "reasonably susceptible to [a] divergent interpretation' in favor of jurisdiction, the Court must adopt that reading."  *Nat'l Ass'n for Home Care & Hospice v. Becerra*, No. 23-cv-1942-TNM, 2024 WL 1833881, at *6 (D.D.C. Apr. 26, 2024) (quoting *Am. Clinical Lab'y Ass'n*, 931 F.3d at 1204).[9]

Applying these lessons to the case at hand, the Court concludes that the plaintiffs' challenge to the inaugural standardized amounts is not inextricably intertwined with the unreviewable budget neutrality adjustments.  First, it cannot be fairly said that the standardized amount calculation is the "entire basis," factually or methodologically, for the unreviewable budget neutrality adjustment, nor that the latter "subsumes" the former.  As discussed above, the two calculations constitute distinct phases within the initial IPPS calculation methodology, separated by four intervening calculations.  What's more, the product of the budget neutrality adjustments is not the final output of the IPPS calculation; the standardized amounts and budget neutrality adjustments are both co-equal, intermediate steps in a broader multi-step process.  There is no hierarchical relationship, textually or functionally, between them.

Second, the unreviewable budget neutrality adjustment is in no way textually integrated, by internal cross-references or otherwise, with the standardized amount calculation that the

---

[9] The *Nat'l Ass'n for Home Care* court recently applied several of these same criteria to find that the Bipartisan Budget Act of 2018, 42 U.S.C. § 1395fff, did not bar judicial review of the Secretary's 2023 adjustments to the base payment rate for home health agencies, despite a statutory provision precluding review of the Secretary's calculation of budget-neutral standard prospective payment amounts.  2024 WL 1833881, at *6–7 (D.D.C. Apr. 26, 2024).  The court reasoned that the two provisions were not inextricably intertwined because the two agency actions at issue were "mandated in different statutory subsections to perform different functions, at different times, through different rulemakings," and that one did not textually or functionally subsume the other.  *Id.*  Although this case is not binding authority, its distillation of the "inextricably intertwined" line of cases is persuasive, and reflects many of the same themes identified herein.

plaintiffs are challenging. To the contrary, as just described, they are separated by multiple intervening subparagraphs, with no direct linkages between them.

Third, although the inaugural standardized amount calculations and budget neutrality adjustments were implemented in the same rulemaking process and neither imposed distinct obligations on private parties, *see* 49 Fed. Reg. 234, 251–259 (Jan. 3, 1984), nevertheless these two calculations had vastly different temporal dimensions. Congress intended the inaugural standardized amounts to be carried forward via subsequent rulemakings each year, with periodic adjustments for inflation and case mix. *See* 42 U.S.C. § 1395ww(d)(3) (providing for calculation of new payment rates for fiscal years after 1984 by updating the prior years' standardized amounts). By contrast, and as discussed at length above, the inaugural budget neutrality adjustments were never meant to be carried forward, and only took place in the first two years of the IPPS system. *See* 42 U.S.C. § 1395ww(d)(2)(F) (prescribing budget neutrality adjustments for fiscal year 1984); *id.* § 1395ww(d)(3)(C) (prescribing budget neutrality adjustments for fiscal year 1985). It is difficult to imagine, without a stronger textual justification, that by shielding one temporary process from review, Congress also intended to silently immunize a different process that would serve as the starting point for every annual IPPS rulemaking in perpetuity.

Fourth, a challenge to the inaugural standardized amounts is not "unavoidably a challenge" to the budget neutrality adjustments. It may be true that the plaintiffs' challenge to the inaugural standardized amounts strongly implies that the Secretary's budget neutrality adjustments were wrong,[10] but *American Clinical Laboratory Association* counsels that this is

---

[10] The plaintiffs, for their part, dispute this, and have compiled a report claiming that if the Secretary had properly accounted for transfers in his estimate of the standardized amount, he would have *also* accounted for transfers in his estimate of what the costs of the Medicare program would have been under the "reasonable costs" model, which is the benchmark the Secretary used to calculate the budget neutrality adjustment factor. Pls.' Mot. for Summ. J. at 41. Because the effects of excluding transfers would have applied proportionally on both sides of the budget-neutrality

not enough to implicate the budget neutrality Preclusion Provisions.  The plaintiffs seek no damages for any deficiency in the budget neutrality adjustments; their claims are limited to their alleged underpayment in fiscal year 2019.  If their challenge should succeed, the Secretary would be required to calculate what the plaintiffs' 2019 compensation would have been if the Secretary had excluded transfers from the inaugural cost-per-discharge calculation.  But given that the budget neutrality requirements—unlike the standardized amounts—have no ongoing manifestation today, the Secretary would not, seemingly, be required to reassess what the budget neutrality adjustments *would have* been for fiscal years 1984 and 1985 if he had calculated the inaugural standardized amount correctly.  And even if he did have make such a calculation, it would be only incidental to the plaintiffs' challenge; he would not have to pay any damages based on his reassessment.  Neither would the Court ever be required to affirmatively declare that the budget neutrality adjustments were incorrect.  In other words, no matter the outcome, the budget neutrality adjustments of 1984 and 1985 will be left effectively intact, and Congress's clear intention to keep the IPPS program budget-neutral for those fiscal years will be preserved. It is hard to see how the bar on judicial review of the budget neutrality adjustments would be "eviscerated" by such an outcome.  *Cf. DCH*, 925 F.3d at 506; *accord Saint Francis*, 894 F.3d at 298 (Kavanaugh, J., concurring) (distinguishing between impermissibly "seeking to reopen

---

equation, the plaintiffs argue that if the Secretary had properly excluded transfers from the count of discharges, the outcome would have been that the inaugural standardized amounts would have been *higher* than they actually were, but the budget neutrality adjustment factor would have stayed the same.  They contend, therefore, that their challenge to the standardized amount calculation does not implicate the budget neutrality adjustments at all, and therefore does not constitute even an indirect challenge to those adjustments.  The defendant responds that this argument rests on mere speculation about how the Secretary would have calculated the hypothetical costs of the "reasonable costs" model.  Def.'s Mot. for Summ. J. at 29.  The defendant also counters that, even if the adjustment *percentage* would have been the same had the Secretary symmetrically excluded transfers, the ultimate dollar amount of the budget neutrality adjustment would have nevertheless changed, thus implicating the Preclusion Provisions anyway.  *Id.*  The Court need not address this disagreement because, as the rest of this paragraph concludes, the plaintiffs' lawsuit is not "unavoidably a challenge" to the Secretary's budget neutrality adjustment, *even if* it implies that the budget neutrality adjustment percentage was wrong.  *Cf. DCH*, 925 F.3d at 503.

closed cost years" on the one hand versus "merely challenging the factual inputs for the *ongoing* calculations of reimbursements for *open* cost years" on the other, and stating that the hospital's challenge to the cost-per-discharge calculation methodology does not impinge "the agency's interest in finality") (emphasis in original).

At a minimum, then, the Preclusion Provisions are "reasonably susceptible" to the narrower interpretation that the plaintiffs urge. *Am. Clinical Lab'y Ass'n v. Azar*, 931 F.3d at 1205.[11]  Accordingly, mindful of the strong presumption of review embedded within the APA, that is the reading the Court must adopt.  The Court therefore holds that the plaintiffs' challenge to the inaugural standardized amount calculation is not "inextricably intertwined" with the unreviewable budget neutrality adjustments, and that the PRRB therefore has subject matter jurisdiction over the plaintiffs' challenge.[12]

---

[11] In further support of their narrower interpretation of the Preclusion Provisions, the plaintiffs point to an earlier decision of the PRRB in which the Board expressly endorsed the plaintiffs' position that the Preclusion Provisions do not bar review of the 1984 and 1985 standardized amounts. Pls.' Mot. for Summ. J. 33 (citing *Columbia/HCA v. BCBS*, PRRB Dec. No. 2000-D74 (Aug. 18, 2000)).  The Secretary concedes that this was once the PRRB's position, but notes that in dismissing the plaintiffs' 2019 appeals, the Board reconsidered and rejected its prior stance.  Defs.' Mot. for Summ. J. 35.  Even so, the plaintiffs contend, the fact that the Board previously endorsed their interpretation of the Preclusion Provisions for decades means that those provisions are at least "reasonably susceptible" to their preferred reading.  To be sure, the Board's late-breaking and suspiciously convenient volte-face on this issue raises eyebrows and deserves attention.  But it is ultimately for the Court to interpret this statute and decide, as a matter of law, whether it is reasonably susceptible to the interpretation urged by the plaintiffs, as it has done throughout this Opinion.  *See generally Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024).  The fact that the Board once endorsed the plaintiffs' preferred reading of the statute does not absolve the Court of its duty to decide that question for itself.

[12] The defendant questions why, as a policy matter, Congress would have precluded review of the budget neutrality adjustments but permitted challenges to the standardized amount calculations.  *See* Def.'s Reply at 14 ("[T]here is . . . no discernable reason why Congress would *want* to limit preclusion in the manner plaintiffs suggest.").  The Court is not in the business of second-guessing Congress's motives and must give effect to statutes as written.  Even so, it is not difficult to imagine a coherent policy rationale underlying the plaintiffs' interpretation of the statute.  The budget neutrality adjustments involved a complicated set of calculations, requiring the Secretary to make numerous estimates and assumptions as to how hospitals would have behaved had the IPPS system never been implemented.  *See* 48 Fed. Reg. 39752, 39767, 39887–39888 (Sept. 1, 1983).  Contemporary challenges to these assumptions could have thwarted Congress's intentions to keep the program budget-neutral or delayed implementation of IPPS.  It is entirely plausible that Congress meant to immunize the Secretary's exercise of discretion in formulating the budget neutrality adjustments, while still permitting courts to police the Secretary's less discretionary calculation of the standardized amounts, particularly because the latter would continue to have a lingering effect on Medicare compensation for years after the budget neutrality adjustments had run their course.

**VI.     The Court Does Not Have Jurisdiction Under the *Ultra Vires* Doctrine**

The plaintiffs argue that, even if the Preclusion Provisions implicitly bar review of the Secretary's cost-per-discharge calculation, the Court nevertheless has jurisdiction to entertain their challenge under the *ultra vires* doctrine, which is available to correct agency action taken in excess of the agency's statutory authority. *See Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 189–90 (D.C. Cir. 2006). The Court has already determined that the Preclusion Provisions do not bar review of this calculation, but the Court must nevertheless consider the plaintiffs' *ultra vires* argument because it dictates how the litigation should progress from this point onward. If the plaintiffs cannot establish *ultra vires* jurisdiction, the appropriate next step is to remand the case to the agency, which will likely result in certification for expedited judicial review. *See Bayshore Cmty. Hosp*, 325 F. Supp. 3d at 21 (citing 42 C.F.R. § 405.1867). Remanding for this purpose may seem like a pointless formality, but as another court in this District has concluded, the statutory scheme appears to condition the district court's jurisdiction on the plaintiffs' receipt of expedited judicial review certification. *Id.* at 23 (first citing *Billings Clinic v. Azar*, 901 F.3d 301, 310–13 (D.C. Cir. 2018), then citing *Allina Health Servs. v. Price*, 863 F.3d 937, 941 (D.C. Cir. 2017)). Additionally, if and when the case returns to federal court, the parties' briefs will be focused on the merits of the dispute, rather than the jurisdictional questions addressed herein. On the other hand, if the plaintiffs' *ultra vires* claim is successful, it would "invalidate the rule and obviate any need to remand" the case to the PRRB. *Am. Clinical Lab'y Ass'n*, 931 F.3d at 1208. The Court concludes that *ultra vires* review is not available here.

*Ultra vires* review is warranted only in extraordinary cases and has repeatedly been described as "extremely limited [in] scope." *See, e.g.*, *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 721–22 (D.C. Cir. 2022) (quoting *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988)). Courts have even liked it to a "Hail Mary pass" which "in court as in football

. . . rarely succeeds." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).  It is reserved for those rare situations where an agency "disregard[s] a specific and unambiguous statutory directive, or . . . violate[s] some specific command of a statute . . . . Garden-variety errors of law or fact are not enough." *Griffith*, 842 F.2d at 493 (internal quotations and citations omitted).  To successfully plead a claim for *ultra vires* review, a plaintiff must show that "(i) there is no express statutory preclusion of all judicial review; (ii) 'there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory[.]'"  *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (quoting *Nyunt*, 589 F.3d at 449).

The plaintiffs have satisfied the first prong, as determined above, but their argument stumbles over the second and third.  As for the second element, the Court has already clarified that the PRRB has subject matter jurisdiction to entertain the plaintiffs' challenge and certify it for judicial review, affording an "alternative procedure for review of the [plaintiffs'] statutory claim . . . ."  *Fed. Express Corp.*, 39 F.4th at 763.   And regarding the third, the plaintiffs do not contend that § 1395ww explicitly defines "discharge" at all, let alone so as to unambiguously exclude transfers.  They *do* gesture to multiple rulemakings in which the Secretary appears to acknowledge the difference between transfers and discharges, some of which were quite close in time to the establishment of the inaugural IPPS rates.  *See* Pls.' Mot. for Summ. J. 6–8.  But the mere fact that an agency acts inconsistently—even with its own regulations—is not enough to surmount the extremely high bar a plaintiff must clear to claim *ultra vires* review.  A direct conflict with a "clear and mandatory" statutory requirement is needed, and none exists here. Thus, the Court cannot say that the Secretary's decision to include transfers in his count of

discharges runs "contrary to a specific prohibition in the statute," which is what the plaintiffs must show. *Fed. Express Corp.*, 39 F.4th at 763. This is not to prejudge the plaintiffs' likelihood of success on the merits; it is merely to say that the plain language of the statute does not compel their victory so obviously as to sustain a claim for *ultra vires* jurisdiction.[13]

## VII.    The Court Will Not Impose Deadlines on Remand at This Time

Lastly, the plaintiffs urge the Court to retain jurisdiction on remand and direct the agency to resolve their request for expedited judicial review certification within a prescribed timeline. Pls.' Mot. for Summ. J. 43–44. The D.C. Circuit counsels that "'only in rare . . . cases does the court direct the agency how to resolve a problem'" on remand, and that the usual course is to "simply point[] out the legal error and leav[e] its resolution up to the agency." *Allina Health Servs. v. Azar*, No. 16-cv-150-RC, 2020 WL 7042869, at *1 (D.D.C. Jan. 2, 2020) (citing *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1111 (D.C. Cir. 2014)).

In this case, imposing firm deadlines upon the Secretary would be inappropriate. As the case proceeds from here to a determination on the merits, the agency should be given an opportunity to examine the administrative record and determine whether it is adequately developed. However, the Court is cognizant of the fact that this dispute has been dragging on, in some form, for nearly two decades. Therefore, the Court will order the parties to submit periodic status reports updating the Court on the parties' progress toward finalizing the administrative

---

[13] Although the Court agrees with the Secretary that, for the reasons already set forth, the plaintiffs have not met the *ultra vires* requirements, the Secretary also argues that *ultra vires* jurisdiction is lacking because it would be "absurdly burdensome" to require the Secretary to correct the current IPPS rates anytime an error is identified in the underlying cost reporting data. Def.'s Mot. for Summ. J. 40. This argument misses the mark. First, the difficulty and cost of remedying wrongful agency action has no bearing on the availability of *ultra vires* review, or on judicial review of agency actions at all. One might imagine that the agency errors which cost the most to fix are the ones most in need of fixing. Second, to state the obvious, the plaintiffs do not allege an error in the cost reporting data, over which the Secretary has admittedly limited control; they allege that the Secretary has erred in his interpretation of that data, which is quite different than pointing out that a few of the Secretary's observation points were miscoded here or there.

record (if any additional supplementation is necessary) and certifying the dispute for judicial review.  If these reports show inadequate progress, the Court will consider imposing deadlines.

## VIII.    Conclusion

"Very rarely do statutes withhold judicial review . . . for in such a case statutes would in effect be blank checks drawn to the credit of some administrative officer or board." *Bowen*, 476 U.S. at 671 (quoting S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)).  The Secretary has already been foiled by the D.C. Circuit twice, in *Kaiser* and *Saint Francis*, in his efforts to skirt judicial review of predicate fact challenges like the one at hand.  The Secretary now seeks to do so once more by urging this Court to adopt an expansive reading of the Preclusion Provisions that is unsupported either by the statutory text or the doctrine of "inextricably intertwined" agency action.  The Secretary has not met his "'heavy burden' . . . to show that Congress 'prohibit[ed] . . . review' of the agency's compliance with a legislative mandate." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (quoting *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975)).  The Court accordingly concludes that the plaintiffs may seek administrative and judicial review of their predicate fact challenge to the Secretary's inaugural IPPS standardized amount calculation.  However, the plaintiffs' claim for *ultra vires* review is unsupported, so the case will be remanded to the proper agency authorities.

*                    *                    *

Therefore, for the reasons contained herein, the Court will **DENY** the defendant's Motion for Summary Judgment, **GRANT** the plaintiffs' Motion for Summary Judgment as to the Board's jurisdiction, **DENY** the plaintiffs' Motion as to their claim for *ultra vires* review, and **REMAND** the dispute for further proceedings, to be accompanied by periodic status reports every 30 days. A separate Order shall issue consistent with this Opinion.

Date: _____ 12-20-24 _____

Royce C. Lamberth
United States District Judge